UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| RONALD CEREMELLO, RANDALL MAINGOT, GEORGE ANDREW RAYNE, ROBERT LOVELL, and SAMUEL HUFFMAN, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation<br><br>     Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................ 1

II.   JURISDICTION ................................................................ 8

III.  VENUE ............................................................................. 9

IV.   PARTIES ......................................................................... 10

    A.    Plaintiffs .................................................................. 10

        1.    Arizona Plaintiff......................................... 10

        2.    Florida Plaintiffs ........................................ 11

        3.    Hawaii Plaintiff .......................................... 13

        4.    Massachusetts Plaintiff .............................. 15

        5.    Oregon Plaintiff.......................................... 17

    B.    Defendant ................................................................ 19

        1.    Ford Motor Company ................................. 19

V.    FACTUAL ALLEGATIONS .......................................... 20

    A.    Coastdown testing .................................................. 20

    B.    The coastdown results are used to create fuel economy
        information posted on vehicles' windows and used in
        advertising. ............................................................. 22

    C.    Ford admits improper coastdown testing on the 2019
        Ranger...................................................................... 28

    D.    CAFE standards provide manufacturers with credits for low
        emissions. ................................................................ 31

    E.    Criminal investigation ........................................... 37

    F.    Mechanism of coastdown cheating ................................. 38

    G.    F-150 and Ranger test results ........................................... 42

H.    Ford's History of Cheating.................................................. 52

I.    Ford advertising for the Ranger emphasizes fuel economy............. 53

J.    Ford promotes the F-150 as best in class for fuel economy or
      publishes MPG estimates to beat its competition. ........................... 54

K.    Economic harm.................................................................. 63

VI.   TOLLING OF THE STATUTE OF LIMITATIONS ................................ 63

A.    Discovery rule tolling......................................................... 63

B.    Fraudulent concealment tolling............................................. 64

C.    Estoppel ......................................................................... 64

VII.  CLASS DEFINITIONS ................................................................ 65

VIII. CLASS ALLEGATIONS ............................................................. 70

A.    Claims brought on behalf of the Arizona Subclass......................... 70

COUNT 1 VIOLATION OF THE ARIZONA CONSUMER FRAUD
      ACT (ARIZONA REV. STAT. § 44-1521 *ET SEQ.*) ................................ 70

COUNT 2 BREACH OF CONTRACT  (BASED ON ARIZONA LAW).......... 74

COUNT 3 BREACH OF EXPRESS WARRANTY (ARIZ. REV. STAT.
      § 47-2313, *ET SEQ.*)............................................................... 75

COUNT 4 FRAUDULENT CONCEALMENT (BASED ON ARIZONA
      LAW)............................................................................... 78

COUNT 5 ................................................................................. 84

NEGLIGENT MISREPRESENTATION............................................... 84

COUNT 6 UNJUST ENRICHMENT.................................................... 85

B.    Claims Brought on Behalf of the Florida Subclass......................... 85

COUNT 7 VIOLATIONS OF THE FLORIDA UNFAIR AND
      DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201
      *ET SEQ.*) ....................................................................... 85

COUNT 8 BREACH OF CONTRACT  (BASED ON FLORIDA LAW) .......... 89

COUNT 9 BREACH OF EXPRESS WARRANTY (FLA. STAT. § 672.313) ...................................................................... 91

COUNT 10 FRAUDULENT CONCEALMENT (BASED ON FLORIDA LAW) ................................................................................ 93

COUNT 11 ........................................................................................... 99

NEGLIGENT MISREPRESENTATION ............................................... 99

COUNT 12 UNJUST ENRICHMENT ................................................ 100

    C.    Claims brought on behalf of the Hawaii Subclass ........................ 101

COUNT 13 VIOLATION OF THE HAWAII ACT § 480-2(A) (HAW. REV. STAT. § 480 *ET SEQ.*) .................................................. 101

COUNT 14 BREACH OF CONTRACT  (BASED ON HAWAII LAW) ......... 105

COUNT 15 BREACH OF EXPRESS WARRANTY (HI REV. STAT. §§ 490:2-313 & 490:2A-519) .................................................... 106

COUNT 16 FRAUDULENT CONCEALMENT (BASED ON HAWAII LAW) ............................................................................ 109

COUNT 17 ......................................................................................... 115

NEGLIGENT MISREPRESENTATION ............................................. 115

COUNT 18 UNJUST ENRICHMENT ................................................ 115

    D.    Claims brought on behalf of the Massachusetts Subclass ............. 116

COUNT 19 VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A) (MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*) .............................................................................. 116

COUNT 20 BREACH OF CONTRACT  (BASED ON MASSACHUSETTS LAW) ..................................................... 120

COUNT 21 BREACH OF EXPRESS WARRANTY (MASS. GEN. LAWS CH. 106, § 2-313) .......................................................... 122

COUNT 22 FRAUDULENT CONCEALMENT (BASED ON MASSACHUSETTS LAW) ..................................................... 126

COUNT 23 ......................................................................................... 132

NEGLIGENT MISREPRESENTATION ............................................................. 132

COUNT 24 UNJUST ENRICHMENT ............................................................. 132

    E.    Claims Brought on Behalf of the Oregon Subclass ........................ 133

COUNT 25 VIOLATION OF THE OREGON UNLAWFUL TRADE
    PRACTICES ACT (OR. REV. STAT. § 646.605 *ET SEQ.*) ................... 133

COUNT 26 BREACH OF CONTRACT  (BASED ON OREGON LAW) ....... 137

COUNT 27 BREACH OF EXPRESS WARRANTY (OR. REV. STAT. §
    72.3130) ................................................................................................ 139

COUNT 28 FRAUDULENT CONCEALMENT (BASED ON OREGON
    LAW) ..................................................................................................... 142

COUNT 29 ....................................................................................................... 147

NEGLIGENT MISREPRESENTATION ............................................................. 147

COUNT 30 UNJUST ENRICHMENT ............................................................. 148

    F.    Claims Brought on Behalf of the Nationwide Class ...................... 149

COUNT 31 VIOLATION OF THE MAGNUSSON-MOSS
    WARRANTY ACT (15 U.S.C. §§ 2301 *ET SEQ.*) ................................. 149

COUNT 32 FRAUD ......................................................................................... 152

REQUEST FOR RELIEF ................................................................................. 153

DEMAND FOR JURY TRIAL ......................................................................... 155

The allegations herein are based on Plaintiffs Ronald Ceremello, Randall Maingot, George Andrew Rayne, Robert Lovel, and Samuel Huffman's ("Plaintiffs") personal knowledge and allege the following based upon the investigation of counsel, the review of scientific papers, and the proprietary investigation of experts.

## I.   INTRODUCTION

1.      Car makers know that one of the most important factors for a consumer purchasing a vehicle is fuel economy. With vehicle purchases and leases among the largest transactions most consumers will carry out in their lifetime, consumers trust the fuel economy rating displayed in a vehicle's window sticker to help them make important financial decisions.

2.      This case arises because Defendant Ford Motor Company ("Ford") cheated on its fuel economy testing on some of its best-selling and most popular trucks. Ford then used its inaccurate fuel economy ratings on the window stickers to sell and lease these trucks to consumers. Over a million Ford truck owners are now driving vehicles that will cost them thousands of dollars more to own or lease than they anticipated. Because of Ford's deception, all purchasers and lessees of these vehicles paid more for these vehicles than they are actually worth.

3.      Plaintiffs bring this class action for a Class defined as:

> All persons who purchased or leased a Ford vehicle whose published EPA fuel economy ratings, as printed on the

vehicles' window sticker, were more than the fuel economy rating produced by a properly conducted applicable federal mileage test. The vehicles in the Class include but are not limited to the model year 2019-2020 Ford Ranger and the 2018-2020 Ford F-150.

4.     These vehicles are hereinafter referred to as the "Coastdown Cheating Vehicles" and include the 2019-2020 Ford Ranger and the 2018-2020 F-150 series trucks, and likely also include other Ford vehicles.

5.     A Coastdown test is a procedure that determines metrics used to calculate a vehicle's fuel economy values or "MPG Rating" (miles per gallon). Coastdown testing tells a manufacturer how much rolling resistance and drag a vehicle has so that when a vehicle is testing on a dynamometer, the manufacturer knows how much drag and rolling resistance to apply to the vehicle to simulate the road.

6.     Ford fudged its coastdown testing and used inaccurate drag and resistance figures to boost the vehicles' "EPA" (Environmental Protection Agency) mileage ratings.

7.     On the window sticker of every Ford F-150 and Ford Ranger are EPA-required indications of fuel economy including city and highway mileage, miles per gallon, and a combined city and highway miles per gallon statement.

8.     Ford knows that fuel economy is material to consumers.

9.     Testing of the 2018 F-150 using the mandated coastdown procedure reveals that Ford did not follow appropriate coastdown testing procedures.  The window sticker or "Monroney sticker" for a 2018 Ford F-150 V6 indicates mileage of 20 city, 26 highway, and 22 combined.  Accurate coastdown testing of a 2018 Ford F-150 V6 reveals the following:  The real highway fuel number is 22.7 MPG compared to 26.6 reported by Ford to the EPA.  For city driving it is 17.7 MPG compared to 19.6 reported to the EPA.  Thus, the highway fuel difference is 15% and the city difference 10%.  Assuming the lifetime of a truck is 150,000 miles, at the real city miles per gallon rates, city driving would consume an extra 821 gallons over the lifetime of the truck.  The highway extra fuel (extra means real MPG versus Ford's reported MPG) is 968 gallons.

10.     These are material differences as manufacturers fight for every 1/10th of a difference in miles per gallon both to attract customers and to earn credits under the applicable environmental emissions regulations.

11.     Ford's motives in overstating vehicle miles per gallon were: (1) to advertise the vehicles as "Best in Class" for fuel economy or to advertise a fuel economy that would beat the competition and/or be attractive to consumers, (2) to attract customers based on fuel economy ratings, and (3) to earn more credits for Ford under the U.S. CAFE environmental regulations since less fuel burned means less emission.

12.     Ford has admitted that the 2019 Ranger is just the first model that is being investigated by the government for improper coastdown testing.  As explained herein, Plaintiffs' testing of the 2018 F-150 reveals similar coastdown cheating.

13.     Ford sold approximately 1 million 2018 and 2019 F-150s.  The extra fuel costs, with the same assumptions above, for all 2018 and 2019 F-150s would be approximately $2.32 billion for city driving, $2.09 billion highway, and $1.9 billion combined.

14.     The 2018, 2019, and 2020 F-150 are virtually identical in engine and body configuration.  In fact, on its applications to certify fuel economy ratings and emissions certifications for the 2019 and 2020 F-150, Ford used the same vehicle serial numbers and presented the same emissions test numbers to the EPA as it did for the 2018 F-150 application. Likewise, the 2020 Ranger is virtually identical in engine and body configuration to the 2019 Ranger and Ford has used the same vehicle serial number and presented the same emissions test numbers to the EPA as it did for the 2019 Ranger application.

15.     Ford deliberately misrepresented or miscalculated certain road testing factors during internal vehicle testing processes in order to report that its vehicles were more fuel efficient than they actually were.  In particular, Ford miscalculated something called "Road Load," which is the force that is imparted on a vehicle while driving at a constant speed over a smooth, level surface from sources such as tire

rolling resistance, driveline losses, and aerodynamic drag.[1]  Ford's internal lab tests did not account for these forces, which lead to better—and entirely inaccurate—fuel economy projections.

16.    Despite Ford's own employees questioning its testing practices and the calculations that Ford was utilizing for fuel economy ratings, at least by September 2018,[2] Ford took no action to correct the problems nor to alert consumers that their test methods were flawed and that consumers would not get the promised fuel economy.

17.    With respect to its 2019 Ford Ranger, Ford promised that its midsize truck "will deliver with durability, capability and fuel efficiency, while also providing in-city maneuverability and the freedom desired by many midsize pickup truck buyers to go off the grid."[3]  Ford also claimed that its "All-New Ford Ranger

---

[1] *See* Exhibit 1, *Determination and Use of Vehicle Road-Load Force and Dynamometer Settings*, United States Environmental Protection Agency (Feb. 23, 2015), https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1 (last visited Aug. 11, 2020).

[2] Exhibit 2, Natasha Singer, *Ford is Investigating Emissions and Fuel Efficiency Data*, The New York Times (Feb. 21, 2019), https://www.nytimes.com/2019/02/21/business/ford-emissions.html?module=inline (last visited Aug. 11, 2020).

[3] Exhibit 3, *2019 Ford Ranger Most Fuel-Efficient in its Class, Because Of Course It Is*, The Newswheel (Dec. 21, 2018), https://thenewswheel.com/2019-ford-ranger-most-fuel-efficient/ (last visited Aug. 11, 2020) ("Statement from Todd Eckert, Ford Truck Group's Marketing Manager").

[was] Rated Most Fuel Efficient Gas-Powered Midsize Pickup in America."[4]  "With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined, 2019 Ford Ranger is the most fuel efficient gas-powered midsize pickup in America."[5]  Ford claimed the 2019 Ranger "is the no-compromise choice for power, technology, capability, and efficiency whether the path is on road or off."[6]

18.    Ford knew that to sell the Ranger, it had to tout it had fuel efficiency, and this promise was material to consumers.

19.    There is no question that Ford used the fuel efficiency ratings as a selling tool to entice consumers into purchasing the 2019 Ford Ranger.  Indeed, Ford promised that "[t]he adventure-ready 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America—providing a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition.  The all-new Ranger has earned EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined for 4x2 trucks."[7]  Ford claimed that "[t]his is the best-in-class EPA-estimated city fuel

---

[4] Exhibit 4, *Adventure Further: All-New Ford Ranger Rated Most Fuel-Efficient Gas-Powered Midsize Pickup in America*, Ford Media Center (Dec. 11, 2018), https://media.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html (last visited Aug. 11, 2020).
[5] *Id*.
[6] *Id*.
[7] *Id.*

economy rating of any gasoline-powered four-wheel-drive midsize pickup and it is an unsurpassed EPA-estimated combined fuel economy rating."[8]

20.     Fuel economy was also used as a tool to entice customers to buy the Ford F-150.  Ford promised that certain of 2018 F-150s were "best in class" for fuel economy, or promised certain city, highway and combined fuel miles per gallon for other F-150 models that were robust enough that Ford believed would make them attractive to consumers.

21.     In contrast to Ford's promises, as noted above, scientifically valid testing has revealed that the vehicles (i) are not as fuel efficient as promised; (ii) are not what a reasonable consumer would expect; and (iii) are not what Ford had advertised. Further, the vehicles' promised power, fuel economy and efficiency, and towing capacity are obtained only by altering the testing calculations.

22.     Ford's representations are deceptive and false, and Ford sold its 2019 Ford Rangers and 2018-19 F-150 models while omitting information that would be material to a reasonable consumer; namely, that Ford miscalculated factors during internal vehicle testing processes in order to report that its vehicles were more fuel efficient than they actually were, and discounted common real-world driving conditions.

---

[8] *Id.*

23.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Coastdown Cheating Vehicles. Plaintiffs seek damages, injunctive relief, and equitable relief for Ford's misconduct related to the design, manufacture, marketing, sale, and lease of the Coastdown Cheating Vehicles, as alleged in this Complaint.

## II.     JURISDICTION

24.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiffs and Defendant reside in different states. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

25.     This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Class Action Fairness Act of 2005, because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class members reside across the United States 28 U.S.C. § 1332(d)(1), (2). The citizenship of each party is described further below in the "Parties" section.

26.     This Court has personal jurisdiction over Ford pursuant to 18 U.S.C. § 1965(b) & (d). This Court has personal jurisdiction over Ford because it has its principal place of business here, minimum contacts with the United States, this

judicial district, and this State, and it intentionally availed itself of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of Ford vehicles in this State and District. At least in part because of Ford's misconduct as alleged in this lawsuit, the Coastdown Cheating Vehicles ended up on this state's roads and in dozens of franchise dealerships.

## III.   VENUE

27.    Venue is proper in this Court under 28 U.S.C. § 1391 because Ford maintains its principal place of business in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including, *inter alia*, Ford's decision-making, design, promotion, marketing, and distribution of the Coastdown Cheating Vehicles occurred in this District, and because Defendant conducts a substantial amount of business in this District. Accordingly, Defendant has sufficient contacts with this District to subject Defendant to personal jurisdiction in the District and venue is proper.  Venue is also proper under 18 U.S.C. § 1965(a) because Ford is subject to personal jurisdiction in this District, as alleged in the preceding paragraph, and Ford has agents located in this District.

# IV.    PARTIES

**A.    Plaintiffs**

> **1.    Arizona Plaintiff**

>> **a.  Ronald Ceremello**

28.     Plaintiff Ronald Ceremello is an Arizona citizen and resident of Gilbert, Arizona.  On or around January 25, 2019, he purchased a new 2019 Ford Ranger XLT, paying approximately $53,000. Plaintiff Ceremello compared the alleged fuel efficiency of the Ranger with other similar trucks and selected the Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.

29.     Plaintiff Ceremello purchased the new 2019 Ranger from San Tan Ford, an authorized Ford dealership located in Gilbert, Arizona. Plaintiff Ceremello purchased and still owns this vehicle.  Unbeknownst to Plaintiff Ceremello at the time the vehicle was purchased, it consumes more fuel than advertised.

30.     Plaintiff Ceremello selected and ultimately purchased his vehicle in part because of the stated "best in class" fuel economy.  Before he purchased the 2019 Ranger, Plaintiff Ceremello saw representations about the vehicle's performance, including its fuel economy, on Ford's website, dealer brochures, television commercials and on the vehicle's window sticker.

31.     Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

32.     Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

33.     Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

34.     Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

35.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

## 2.     Florida Plaintiffs

### a.  Randall Maingot

36.     Plaintiff Randall Maingot is a Florida citizen and resident of Miami, Florida.  On or around July 26, 2019, Plaintiff Maingot purchased a 2019 Ford

Ranger XLT Class Vehicle for approximately $35,000.  Plaintiff Maingot selected the 2019 Ford Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.   Prior to purchasing the Ranger, Plaintiff Maingot compared the alleged fuel efficiency of the 2019 Ranger with other similar trucks, including the Chevy Colorado, GMC Canyon, and Toyota Tacoma, and selected the 2019 Ranger based in part on Ford's representations about the vehicle's fuel efficiency.

37.    Plaintiff Maingot purchased the 2019 Ranger truck with VIN 1FTER4EH47622 from Ford of Kendall, an authorized Ford dealership located in Miami, Florida.  Unbeknownst to Plaintiff Maingot at the time the vehicle was purchased, it consumes more fuel than advertised.

38.    Plaintiff Maingot selected and ultimately purchased his vehicle, in part, because of the stated fuel economy, as represented through advertisements and representations made by Ford.

39.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

40.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy

caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

41.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

42.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

43.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 3.    Hawaii Plaintiff

#### a.  George Andrew Rayne

44.    Plaintiff George Andrew Rayne is a Hawaii citizen and resident of Kalaheo, Hawaii. In July 2018, he purchased a new 2018 Ford F-150 pickup paying approximately $46,400.59. Plaintiff Rayne compared the alleged fuel efficiency of

- 13 -

the 2018 Ford F-150 with other similar trucks and selected the 2018 Ford F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

45.    Plaintiff Rayne purchased the 2018 Ford F-150, with VIN 1FTEW1EPXJKC85019 from Midpac Auto Center (Kuhio Ford), an authorized Ford dealership located in Lihue, Hawaii. Plaintiff Rayne purchased and still owns this vehicle.  Unbeknownst to Plaintiff Rayne at the time the vehicle was purchased, it consumes more fuel than advertised.

46.    Plaintiff Rayne selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Rayne recalls that before he purchased the 2018 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, likely on Ford's website and on the vehicle's window sticker.  He also discussed the vehicle's fuel economy with the dealer before purchasing.

47.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

48.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

49.     Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

50.     Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

51.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

**4.     Massachusetts Plaintiff**

> **a.  Robert Lovell**

52.     Plaintiff Robert Lovell is a Massachusetts citizen and resident of Fitchburg, Massachusetts.  On or about December 26, 2018, he leased a new 2018 Ford F-150 pickup paying approximately $42,570.  Plaintiff Lovell compared the alleged fuel efficiency of the 2018 Ford F-150 with other similar trucks, including the Chevrolet Silverado, Dodge Ram, and GMC Sierra, and selected the 2018 Ford

F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

53.     Plaintiff Lovell leased the 2018 Ford F-150 with VIN 1FTEW1E5JFES2850 from Gervais Ford, an authorized Ford dealership located in Ayers, Massachusetts. Plaintiff Lovell continues to lease this vehicle.  Unbeknownst to Plaintiff Lovell at the time the vehicle was leased, it consumed more fuel than advertised.

54.     Plaintiff Lovell selected and ultimately leased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Lovell recalls that before he leased the 2018 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on the vehicle's window sticker.

55.     Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have leased the vehicle or would have paid less for it.

56.     Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of lease in addition to added fuel costs.

57.     Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he leased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

58.     Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and lease and added fuel costs.

59.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase or lease.

### 5.  Oregon Plaintiff

#### a.  Samuel Huffman

60.     Plaintiff Samuel Huffman is an Oregon citizen and resident of North Plains, Oregon.  On or about December 20, 2017, he purchased a new 2018 Ford F-150 pickup paying approximately $55,000. Plaintiff Huffman compared the alleged fuel efficiency of the 2018 F-150 with other similar trucks, including the Dodge Ram, and selected the 2018 F-150 based in part on Ford's representations about the vehicle's fuel efficiency.

61.    Plaintiff Huffman purchased the 2018 F-150 from Damerow Ford, an authorized Ford dealership located in Beaverton, Oregon. Plaintiff Huffman purchased and still owns this vehicle.  Unbeknownst to Plaintiff Huffman at the time the vehicle was purchased, it consumes more fuel than advertised.

62.    Plaintiff Huffman selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Huffman recalls that before he purchased the 2018 F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's television commercials, Ford's website and on the vehicle's window sticker. Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

63.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

64.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had

better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

65.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

66.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase

**B.    Defendant**

    **1.    Ford Motor Company**

67.    Ford Motor Company is a corporation doing business in all 50 states and the District of Columbia and is organized under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan.

68.    At all times relevant to this action, Ford designed, manufactured, sold, and warranted the Coastdown Cheating Vehicles throughout the United States. Ford and/or its agents, divisions, or subsidiaries designed, and manufactured the Coastdown Cheating Vehicles.  Ford also developed and disseminated the owner's manuals, supplements, and warranty booklets, advertisements, and other promotional materials relating to the Coastdown Cheating Vehicles; and Ford

provided these to its authorized dealers for the express purpose of having these dealers pass such materials to potential purchasers at the point of sale. Ford also created, designed, and disseminated information about the quality of the Coastdown Cheating Vehicles to various agents of various publications for the express purpose of having that information reach potential consumers.

## V.   FACTUAL ALLEGATIONS

### A.   Coastdown testing

69.   Ford deliberately miscalculated and misrepresented factors used in vehicle certification testing in order to report that its vehicles used less fuel and emitted less pollution than they actually did.  The certification test-related cheating centers on the "Coastdown" testing and "Road Load" calculations.

70.   A coastdown test is a procedure that determines metrics later used to calculate a vehicle's fuel economy values or "MPG rating." MPG ratings are established using a machine called a "dynamometer." A dynamometer is like a treadmill for vehicles, enabling vehicles to be operated indoors on a stationary platform to simulate real-world vehicle operation. The level of resistance on the dynamometer is adjusted based on coastdown testing for each specific vehicle model to simulate the level of resistance that the vehicle would encounter if operated on the road. Coastdown testing is used to determine the appropriate resistance levels (or "road loads") to use on the dynamometer for a given vehicle model. Coastdown

testing is used to measure all types of resistance encountered by a given vehicle model during real-world operation, including:

- Vehicle aerodynamic resistance, a factor affected by the vehicle's shape, which determines how much energy the vehicle uses to push air out of the way as it moves. The more resistance, the more energy has to be expended.

- Tire rolling resistance, a factor related to tire design that determines how much energy the vehicle has to use to overcome the resistance caused by the interface between the tires and the road.

- Driveline and powertrain mechanical resistance, a factor measuring the vehicle's drivetrain and how much energy the vehicle has to use to overcome internal friction to drive the wheels.

71.    A vehicle that has been properly broken in prior to the test (generally includes vehicle and tire mileage, fluids and fuel, and vehicle warm-up) is driven up to a certain speed, typically around 80 MPH, after which it is put into neutral and allowed to coast until its speed drops below 9 MPH.

72.    Special devices in the vehicle accurately measure environmental conditions (ambient temperature, humidity and barometric pressure), performance data, and speed and distance traveled during the coastdown test.

73.    In order to eliminate the effect of wind speed and direction, the test is performed multiple times (a minimum of 5 runs) on a completely flat, straight, and dry road in both directions of the track. Analysis of the recorded speed and distance information provides the vehicle's road load force.

74.     Ford miscalculated "Road Load," which is a measure of those forces, defined as the force that is imparted on a vehicle while driving at a constant speed over a smooth, level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag.[9]

75.     This measure of forces acting against the vehicle during real-world driving is critical to the simulation of actual driving when a vehicle is tested in the laboratory.  Ford's internal lab tests did not account for these forces, which lead to better—and entirely inaccurate—fuel economy projections, and claims that the vehicles emitted less pollution than they emitted in reality.

**B.     The coastdown results are used to create fuel economy information posted on vehicles' windows and used in advertising.**

76.     The Coastdown test results are sent by Ford to the EPA to be used as the basis for mileage information used on window stickers, also called a "Monroney sticker."

77.     The Monroney sticker is on the window of every new car and includes information about the vehicle's price, engine and transmission specifications, other mechanical and performance specs, fuel economy and emissions ratings, safety ratings, and standard and optional features.

---

[9] *See* Exhibit 1, *supra* fn. 1.

78.     The Monroney sticker is named for A.S. "Mike" Monroney, a longtime Oklahoma congressman who wrote the 1958 Automobile Information Disclosure Act, the federal law that requires the Monroney sticker.

79.     The Monroney sticker lists all features that come standard to the vehicle. This might include air bags, anti-lock brakes, a radio and CD or MP3 player, plus any warranties or additional services such as roadside assistance. Also included on the sticker is a section called "the EPA sticker." The Environmental Protection Agency section of the sticker tells how many miles per gallon of gas the vehicle gets on the highway and in the city. The EPA label provides miles-per-gallon equivalent (MPGe) figures for electric and hybrid cars to help consumers compare the fuel economy of these vehicles with gas- and diesel-powered cars. The EPA section hereinafter will detail the vehicle's potential environmental impact with greenhouse gas emissions.

80.     The fuel economy figures are used by car reviewers and used by consumers to rate cars. For example, trucks are ranked on fuel economy as follows with the Ford F-150 at the top:

### 9 Best Ranked MPG Trucks of 2018: Ranked:

- 2016 Ford F-150 Automatic 2.7L
- 2016 Chevrolet Colorado Automatic 3.6L
- 2015 Chevrolet Silverado 1500 Automatic 4.3L
- 2015 Ford F-150 Automatic 3.5L
- 2014 Chevrolet Silverado 1500 Automatic 4.3L
- 2016 Chevrolet Silverado 1500 Automatic 4.3L

- 2016 Dodge Ram 1500 Automatic 3.6L
- 2016 Ford F-150 Automatic 3.5L[10]

81.     On the popular CarMax site[11], based on fuel economy numbers provided by Ford and published by EPA, CarMax had this to say about putting Ford F-150s near the top:

---

[10] Exhibit 15, Google and related search for F-150 fuel economy.

[11] Exhibit 16, *8 Best Ranked MPG Trucks of 2019: Ranked* (June 27, 2019), https://www.carmax.com/articles/best-mpg-trucks-ranking (last visited Aug. 11, 2020).

# 8 Best Ranked MPG Trucks of 2019: Ranked

**PUBLISHED THURSDAY, JUNE 27, 2019**

## Achieve power and impressive fuel-economy.



Today, more and more manufacturers are producing trucks that get great fuel economy while still delivering impressive horsepower. If you're fuel-conscious and looking for the right truck, we've put together a power-packed list of trucks to help you on your search.

1. 2017 Chevrolet Colorado 2WD Automatic 2.5L




2017 Chevrolet Colorado LT  ©EVOX Images

2. [2018 Ford F-150 2WD Automatic 3.3L](#)




2018 Ford F-150 Lariat  ©EVOX Images

3. [2015 Ford F-150 2WD Automatic 2.7L](#)




2015 Ford F-150 XL  © EVOX IMAGES

4. [2016 Ford F-150 2WD Automatic 2.7L](#)




2016 Ford F-150 XL  © EVOX IMAGES

5. [2017 Nissan Frontier 2WD Automatic 2.5L](#)

 

6. [2015-2016 Ford F-150 4WD Automatic 2.7L](#) & [2017 Toyota Tacoma 4WD Automatic](#)

 

7. [2015 Ford F-150 4WD Automatic 3.5L](#)

 

8. [2015 Chevrolet Silverado 1500 4WD Automatic 4.3L](#)



**C.   Ford admits improper coastdown testing on the 2019 Ranger.**

82.   Ford has admitted that in September of 2018 several of its own employees were questioning its computer modeling and physical test practices for certification of fuel economy and emissions.[12]  Yet, Ford took no action to correct these ongoing misrepresentations or to alert consumers.

83.   Pressured by a pending governmental criminal investigation, Ford has now stated that it will look into the testing of the 2019 Ranger truck before looking at its other vehicles.

84.   When Ford released a statement regarding the problem, truck blogger Andre Smirnov of TheFastLaneTruck.com  (hereinafter "TFL") drove the new Ranger for 1,000 miles, from California to Colorado to test its "TFL" real-world

---

[12] Exhibit 2, *supra* fn. 2.

mileage, and found it achieved only 19.5 MPG, not the 24 MPG certified to the EPA for the 4x4 model.[13]

85.    Having concluded that the actual performance of the Ranger was "nowhere close" to the EPA rated MPG, in March of 2019, the truck blogger tested the Ranger truck on The Fast Lane Truck's 98-mile fuel economy loop.[14]    The highway mileage was only one MPG greater on the test loop than on its 1,000 mile drive.  The TFL test drivers were at a loss for words when they discovered a nearly four MPG discrepancy between the mileage reported on the Ranger's trip meter and what they measured at the pump (21.3 MPG actual versus 25.8 MPG on Ford's trip meter)[15]:

---

[13] Exhibit 5, Andrew Smirnov, *Real-world 2019 Ford Ranger Fuel Economy: Here Is the Unexpected Result after a 1,000 Mile Road Trip (Video)*, TheFastLaneTruck.com (Feb. 23, 2019), https://www.tfltruck.com/2019/02/real-world-2019-ford-ranger-fuel-economy-here-is-the-unexpected-result-after-a-1000-mile-road-trip-video/ (last visited Aug. 11, 2020).

[14] Exhibit 14, Stephen Elmer, *EPA Says the New Ford Ranger Gets 24 MPG on the Highway, But What Does It Really Get at 70 MPH? (Video)* (Mar. 19, 2019), https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/ (last visited Aug. 11, 2020).

[15] Exhibit 6, Video of the testing located at https://youtu.be/W6iLtygCC7Y, embedded in the previously cited article, Exhibit 14, at: https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/.



EPA Says the New Ford Ranger Gets 24 MPG on the Highway, But What Does It Really Get at 70 MPH?

86.    With respect to its 2019 Ford Ranger, Ford promised that its midsize truck "will deliver with durability, capability and fuel efficiency, while also providing in-city maneuverability and the freedom desired by many midsize pickup truck buyers to go off the grid."[16]  Ford also claimed that its "All-New Ford Ranger [was] Rated Most Fuel Efficient Gas-Powered Midsize Pickup in America."[17]  "With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mph combined, 2019 Ford Ranger is the most fuel efficient gas-powered midsize pickup

---

[16] Exhibit 3, *supra* fn. 3.

[17] Exhibit 4, *supra* fn. 4.

in America."[18]  Ford claimed the 2019 Ranger "is the no-compromise choice for power, technology, capability, and efficiency whether the path is on road or off."[19] Ford knew that to sell the Ranger effectively, it had to tout it as having fuel efficiency and reduced emissions, and that such promises were material to consumers.

87.    There is no question that Ford used the fuel efficiency ratings as a sales tool to entice consumers into purchasing the 2019 Ford Ranger.  Indeed, Ford promised that "[t]he adventure-ready 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America—providing a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition.  The all-new Ranger has earned EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined for 4x2 trucks."[20]  Ford claimed that "[t]his is the best-in-class EPA-estimated city fuel economy rating of any gasoline-powered four-wheel-drive midsize pickup and it is an unsurpassed EPA-estimated combined fuel economy rating."[21]

D.    **CAFE standards provide manufacturers with credits for low emissions.**

88.    Ford also reaped a double reward from this cheating.  Cars and trucks are one of the major sources of air pollution, which includes ozone, particulate

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

matter, and other smog-forming emissions. The health risks of air pollution are extremely significant.

89.   Poor air quality increases respiratory ailments like asthma and bronchitis, heightens the risk of life-threatening conditions like cancer, and burdens the American health care system with substantial medical costs.  Passenger cars and trucks are major contributors to pollution, producing significant amounts of nitrogen oxides, carbon monoxide, and other pollution. The U.S. government, through the EPA, has passed and enforced laws designed to protect U.S. citizens from these pollutants and certain chemicals and agents known to cause disease in humans.

252.  The United States has two sets of parallel standards that affect fuel economy: (1) the corporate average fuel economy (CAFE) standards adopted by the National Highway Traffic Safety Administration (NHTSA), an agency within the Department of Transportation (DOT); and (2) greenhouse gas (GHG) emissions standards adopted by the EPA.

90.   Automobile manufacturers must abide by these laws and must adhere to EPA rules and regulations.   One of the major drivers of fuel efficiency improvement are the CAFE standards.  These requirements have nearly doubled the fuel efficiency of vehicles in the U.S.  In addition to the reduced health costs and human illness, CAFE standards are estimated to save each U.S. household approximately $2,000.00 per year in reduced fuel consumption as of 2016.  The

Energy Independence and Security Act (EISA) of 2007 mandated a 40% increase in fuel economy by 2020.

91.     The original CAFE standards set minimum average fuel consumption performance (average miles travelled per gallon of fuel used) for the fleets of new "passenger automobiles" (passenger cars) and "non-passenger automobiles" (light trucks, which includes many SUVs) produced by each manufacturer. The standards for these two types of vehicles differed.

92.     Before standards took effect, the average fuel efficiency for passenger cars was 15.2 MPG). Congress required manufacturers to achieve a fleet average of 18 MPG by 1978, 19 MPG by 1979, and 20 MPG by 1980, rising to 27.5 MPG by 1985, with interim standards to be set by NHTSA. But by 1981, average fuel efficiency for passenger cars had risen to 28.4 MPG, exceeding the standards.

93.     For light trucks, NHTSA set standards that required manufacturers to achieve a fleet average of 17.2 MPG for two-wheel drive vehicles and 15.8 MPG for four-wheel drive vehicles in 1979, rising to 21.5 MPG and 19 MPG respectively by 1989. Over this period, two-wheel drive vehicles increased from 13.4 to 16.9 MPG, while four-wheel drive vehicles increased from 12.3 MPG to 14.4 MPG.

94.     The National Highway Traffic Safety Administration (NHTSA) kept CAFE standards for cars the same from 1985 to 2010, except for a slight decrease in required MPG from 1986 to 1989. Truck standards, initially set in 1976 for 1989

vehicles at 21.5 MPG for 2-wheel drive vehicles and 19 MPG for 4-wheel drive vehicles, were frozen by Congress in the mid-1990s at 20.7 MPG and were not increased until 2005.

95.    However, starting in 2005, Washington policy makers ushered in a number of changes. Between 2005 and 2007, the Bush administration raised the truck fuel efficiency standard from 20.7 to 22.2 MPG. More significantly, in 2007, Congress passed the Energy Independence and Security Act (EISA), which requires model-year 2011 and later vehicles for sale in the U.S. that were manufactured outside the U.S. to achieve a fleetwide gas mileage of 35 MPG and requires vehicles for sale in the U.S. that were manufactured in the U.S. to achieve a fleetwide gas mileage of 27.5 MPG by 2020. In 2009, the Obama administration eliminated the default 27.5 MPG standard and established a new 27.3 MPG standard for 2011 model-year vehicles manufactured domestically and internationally. The new standard was scheduled to increase annually until it reached 35 MPG for 2020 model-year vehicles.

96.    Starting in 2005 for trucks and 2011 for all vehicles, the standard is based on one specific attribute: a manufacturer's collective vehicle footprint. The formula multiplies every vehicle's wheelbase by its average track width for each manufacturer. This creates a relatively simple inverse-linear formula with cutoff values. The attribute-based formula produces one number for each automaker. So

while each model sold does not have to achieve a specific target, the automaker's fleet on a whole must meet its target. This method helps balance earlier standards, which were biased against automakers whose overall vehicle lineup was fuel-efficient, but sold one or two models (typically work trucks) that were not fuel-efficient.

97.     For example, the GM Sierra Denali is a full-size work truck with an MPG range of 16 in the city and 23 on the highway. The Honda Ridgeline is a mid-size truck with an MPG range of 19 in the city and 26 on the highway. To balance the lower fuel efficiency of the Denali, GM also builds the hybrid Chevrolet Volt that gets 42 MPG. If the absolute standard was 20 miles per gallon, drivers would not be able to buy the Denali work truck, which averages 19. But because the standard is by manufacturer and not model, GM can use the Volt to help balance the Denali.

98.     In 2012, NHTSA and the EPA issued joint standards for 2017–2025. While NHTSA's standards continued to focus on fuel efficiency, the EPA's more-stringent regulations targeted reductions in carbon dioxide emissions (greenhouse gas emissions) and not fuel efficiency. NHTSA increased the CAFE standards to 41 MPG by 2021 and 49.7 MPG by 2025. The EPA's standard of 163 g/mi of $CO_2$-equivalent emissions effectively increased standards to 54.5 MPG by 2025. This

54.5 MPG 2025 standard is the first one benchmarked to emissions and not gasoline consumption.

99.     Both the NHTSA and EPA standards offer certain flexibilities, termed "components," to help manufacturers comply with the standards. The first component is a credit trading system that allows manufacturers to carry efficiency and greenhouse gas credits forward by up to five years and backwards by up to three years to achieve compliance and avoid fines. Manufacturers can transfer credit between cars and trucks and trade credits with other manufacturers. Carbon dioxide credits generated for EPA compliance from model year 2016 and before can be carried forward up to model year 2021.

100.   In 2016 NHTSA announced plans to more than double the fines for failing to meet CAFE standards from $5.50 per 0.1 MPG to $14.00. The fine is applied to each 0.1 MPG the automaker falls short and multiplied by the number of vehicles sold in a model year for the entire U.S domestic market. Companies must satisfy both EPA and NHTSA standards. Manufacturers passing EPA's greenhouse gas emissions standards that fail NHTSA's CAFE standards still pay the fine. Thus, manufacturers have a clear economic motivation to meet the standards.

101.   Under the increasing federal standards, Ford also began to market its gasoline powered vehicles as being cleaner with high fuel economy.  As the Ford Ranger was out of the market for eight years, Ford took a targeted marketing

approach for the 2019 Ranger, focusing on "outdoorsy digital ads" that pitched the truck to outdoor adventurists.[22] Ford capitalized on its fuel efficiency as a selling point over its competitors.[23] Ford sought a strong re-entry of the Ranger into the U.S. market by pitching it as amazingly fuel efficient.

### E. Criminal investigation

102. Ford Motor Company's March 2019 Securities and Exchange Commission filing revealed that it is under criminal investigation by the United States Department of Justice for its emissions certification practices.[24]

103. Ford Motor Company is a leading auto manufacturer, having sold 2.5 million vehicles in 2018. Ford's strategy has increasingly focused on the manufacture and sale of larger gas-guzzling pickup trucks, sport utility vehicles (SUVs) and vans. These vehicles are, of course, the most challenged by emissions standards and fuel efficiency. Ford's focus on this segment of the market created an immense incentive to cheat.

---

[22] Exhibit 8, E.J. Schultz, *Ford Takes Targeted Marketing Approach for Ranger Comeback*, AdAge (Mar. 1, 2019), https://adage.com/article/cmo-strategy/ford-takes-targeted-approach-ranger-comeback/316801 (last visited Aug. 11, 2020).

[23] Exhibit 9, Joey Capparella, *The 2019 Ford Ranger Pickup Gets Slightly Better MPG Ratings Than the Honda Ridgeline*, Car and Driver (Dec. 11, 2018), https://www.caranddriver.com/news/a25470574/2019-ford-ranger-pickup-mpg/ (last visited Aug. 11, 2020).

[24] Exhibit 10, Ford's March 31, 2019 Quarterly Report to the SEC, at page 70: https://www.sec.gov/Archives/edgar/data/37996/000003799619000026/f03312019 10-q.htm.

104.   In September 2018, several Ford employees expressed concerns about the testing practices at Ford pertaining to emissions and fuel efficiency.  In February 2019, Ford admitted it was looking into these concerns about its "computer-modeling methods and calculations used to measure fuel economy and emissions."[25] Kim Pittel, Ford's vice president for sustainability, environment and safety engineering, has admitted to the New York Times that these "calculations [are] used in testing cars for fuel economy ratings and emissions certifications."[26]

## F.    Mechanism of coastdown cheating

105.   The Environmental Protection Agency (EPA) defines "Road load" as follows:

> the force imparted on a vehicle while driving at a constant speed over a smooth level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag.

EPA letter to manufacturers, titled: "*Determination and Use of Vehicle Road-Load Force and Dynamometer Settings*."[27]  These calculations are critical to laboratory fuel efficiency and emissions testing because the vehicle is placed on a dynamometer, which is essentially a treadmill for cars.  When driving on a

---

[25] Exhibit 11, Tiffany Hsu, *Ford Says Justice Dept. Has Opened Criminal Inquiry Into Emissions Issues*, The New York Times (Apr. 26, 2019), https://www.nytimes.com/2019/04/26/business/ford-emissions-criminal-investigation.html (last visited Aug. 11, 2020).

[26] Exhibit 2, *supra* fn. 2.

[27] Exhibit 1, *supra* fn. 1.

dynamometer, the vehicle is stationary and does not experience the drag of air against the vehicle; or of the resistance of the tire against the road surface; or the loss of horsepower that occurs in the drivetrain of the vehicle - the friction, heat, drag, and other various losses that occur between the engine and tires touching the road.



2017 Ford F-350 During Dynamometer Testing

106.   Auto manufacturers use "coastdown" tests of vehicles on the actual roadway to help calculate variables to be utilized in conjunction with dynamometer testing.  Coastdown testing provides data regarding aerodynamic drag, tire rolling resistance, and drivetrain frictional losses and provides technical data used to program the test dynamometers that generate EPA fuel economy and emissions ratings.  In a coastdown test, a vehicle is brought to a high speed on a flat, straight road and then set coasting in neutral until it slows to a low speed.  By recording the time the vehicle takes to slow down, it is possible to model the forces affecting the

vehicle.   Coastdown tests are governed by tests developed by the Society of Automotive of Engineers (SAE).  SAE developed a standard procedure (J2263-Dec 2008) to perform road load measurement using coastdown testing, and a standard procedure (J1263-Mar 2010) to perform road load measurement and dynamometer simulation using coastdown testing. The current government-approved standard for road load measurement using onboard anemometry and the coastdown testing technique is the SAE International Standard.  These standards must be followed by federal regulation.  The data relating to speed and distance are recorded by special instruments to account for various factors that might affect the results.  The test produces data that identifies or maps the drag and other forces acting on the vehicle in the real world.

107.   A coastdown requires planning, data collection, and data processing, but offers many opportunities for manipulation of the data.  Data variability and error can be controlled, but several factors must be considered under SAE standards, including calculation of the mass of the vehicle, tire pressure, weather, and environmental factors (e.g., wind speed, air temperature, humidity, and barometric pressure), aerodynamic factors, and road surface, as well as experiment design and methodology, measurement errors, data acquisition systems, and vehicle qualifications.  The SAE procedure on coastdown testing includes an appendix with

FORTRAN code that processes experimental velocity data and produces a mathematical vehicle force model.

108.   The protocol specifies all conditions under which the engine is tested, including lab temperature and vehicle conditions. Most importantly, the test cycle defines the vehicle speed over time that is used to simulate a typical driving scenario. An example of a driving cycle is shown in Figure A. This graph represents the FTP-75 (Federal Test Procedure) cycle that has been created by the EPA and is used for emission certification and fuel economy testing of passenger vehicles in the United States. The cycle simulates an urban route with frequent stops. The cycle lasts 1,877 seconds (about 31 minutes) and covers a distance of 11.04 miles (17.77 km) at an average speed of 21.2 mph (34.12 km/h).

Figure A



109.   To assess conformance, these tests are carried out on a chassis dynamometer, a fixture that holds a car in place while allowing its driven wheels to turn (a treadmill for cars) with varying resistance meant to simulate the actual load on the engine during on-road driving.  Fuel consumption and emissions are measured during the test and compared to an emissions standard that defines the maximum pollutant levels that can be released during such a test. In the United States, emissions standards are managed on a national level by the EPA. In addition, California has its own emissions standards that are defined and enforced by CARB. California standards are also adopted by a number of other states ("Section 177" states).[28] Together with California, these states cover a significant fraction of the U.S. market, making them a de facto second national standard.

## G.    F-150 and Ranger test results

110.   Testing was conducted on a 2018 Ford F-150 SuperCrew 4x2 truck and a 2019 Ford Ranger SuperCrew 4x2 truck to independently verify the model inputs used to calculate fuel economy of those vehicles.

111.   Fuel economy testing to provide the values listed on the Monroney label of passenger cars and light duty trucks for sale in the United States is performed on a chassis dynamometer, a kind of stationary treadmill that simulates the forces acting

---

[28] Those states are: Connecticut, Maine, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, Delaware, Georgia, and North Carolina.

on the vehicle during real world driving. Dynamometer testing is required by the United States Environmental Protection Agency (US EPA) for emissions certification and fuel economy testing, both for labeling purposes and for compliance with Corporate Average Fuel Economy, or CAFE, standards. Real world models specific to every vehicle tested, called "road load models," are used during testing to ensure the dynamometer accurately simulates the real world frictional losses a vehicle experiences during operation on the road. These models are specific to every vehicle tested for fuel economy. For vehicles having a variety of body configurations, like the F-150 and Ranger, each configuration and weight class (grouped according to "equivalent test weight" by the EPA) will have its own unique model. The road load model is obtained by performing a vehicle "coastdown," a process whereby the time to decelerate a vehicle from a high speed is measured. The standardized technique for performing a coastdown is prescribed in the Code of Federal Regulations, which references the use of Society or Automotive Engineering (SAE) Standard J2263.

112.   In the case of both the 2018 F-150 tested and the 2019 Ranger, the road load obtained in the J2263 coastdown for each vehicle was found to have more resistance (which would result in more fuel consumption) than the road load models reported to the EPA.

113. In order to accurately measure fuel efficiency, the dynamometer rollers must simulate the parasitic frictional forces a vehicle would experience if it were to be driving on the road. The quadratic function below replicates these forces (a combination of driveline parasitic losses, rolling resistance, and aerodynamic drag). The coastdown test yields the coefficients (A, B, and C below) that are used to model a particular vehicle's road load. In certification documents and the EPA fuel economy test database, these are often referred to as the "target coefficients:" $Force(V) = A + B \cdot V + C \cdot V^2$, where V is the speed of the vehicle.

114. Once a vehicle's target coefficients are obtained, the vehicle is calibrated, or "matched," to the dynamometer to determine the force the dynamometer must apply to simulate the target road load. The "match" accounts for the friction and inertia inherent in the dynamometer's driveline and rolls. This process produces a data set called the "Set Coefficients," values specific to a particulate vehicle and a particular dynamometer calibration. Once the set coefficients are obtained, the dynamometer can accurately replicate the weight (or inertia) of the vehicle as well as the road load forces. The processes required by the Code of Federal Regulations, as well as SAE J2264, were strictly followed to match the vehicle to the dynamometer and to perform fuel economy testing.

115. The 2018 Ford F-150 SuperCrew and 2019 Ford Ranger SuperCrew used for testing were selected to replicate vehicles presented in the US EPA fuel

economy test database.[29] The EPA database provides vehicle and test data details including, cab length, drivetrain (4 wheel drive vs 2 wheel drive), axle ratio, engine, and transmission. Furthermore, the database provides the road load model, and the FTP-75, and HWFET results presented to the US EPA to certify the fuel economy. SAE J2263 and EPA Guidance Letter *CD-15-04* provided selection criteria for tire size and trim options based on vehicle population statistics. The test-truck configurations are shown in Table 1.

**Table 1 - Test Vehicles**

| MY/Make | Model | Cab Style | Drivetrain | Axle Ratio | Engine | Transmission | Equivalent Test Weight (lbs) |
|---|---|---|---|---|---|---|---|
| 2018 Ford | F-150 | SuperCrew (4 door) | 4x2 | 3.55 | 2.7L V6 Ecoboost | 10 Speed Auto | 5,000 |
| 2019 Ford | Ranger | SuperCrew (4 door) | 4x2 | 3.73 | 2.3L I4 Ecoboost | 10 Speed Auto | 4,750 |

116.  In preparation for coastdown testing, the trucks and tires were aged to just over 4,000 miles as directed by SAE J2263. The trucks were fitted with an anemometer on a preceding boom, GPS antennae, and an eDAQ XR Lite data acquisition system. The body was checked for any damage that might affect aerodynamic drag. Tire tread depths and pressures were measured. The brakes were checked for contact and the alignment was checked and adjusted as necessary. The F-150 was loaded with sandbags to a scale weight of 4,990 lbs. and the Ranger to

---

[29] Exhibit 7, *Data on Cars used for Testing Fuel Economy*, United States Environmental Protection Agency, https://www.epa.gov/compliance-and-fuel-economy-data/data-cars-used-testing-fuel-economy (last visited Aug. 11, 2020).

4,750 lbs. The trucks were warmed to operating temperature, as per SAE J2263, by driving for more than 30 min at 50 mph. Once warmed, the tire pressures were re-adjusted and the truck immediately tested.

117.   The coastdown test-driver accelerated the test truck to approximately 80 mph, placed the transmission into neutral, and coasted the truck until deceleration reduced the speed below 9 mph. This process was repeated for each truck 12 times: 6 in each direction. Truck speed, time, apparent wind velocity, track temperature, ambient temperature, and pressure were measured and recorded for each run.  This data was used to generate the force target coefficients listed in Table 2 and compared to the EPA Fuel Economy Database target coefficients.

**Table 2 - Target Coefficients (A,B, and C) from Coastdown Tests with Comparison to Values from EPA Database**

| Target Coefficients | Ford F-150 | | Ford Ranger | |
|---|---|---|---|---|
| | From Test | From EPA Database | From Test | From EPA Database |
| A (lbf) | 25.1113 | 26.570 | 23.7939 | 31.540 |
| B (lbf/mph) | 0.9725 | 0.05130 | 0.8954 | 0.29320 |
| C (lbf/mph^2) | 0.0273 | 0.03385 | 0.0288 | 0.03433 |

118.   The quadratic coefficients above are used to tune the dynamometer during the dynamometer match. The effects of these different road load coefficients can be seen in Figure 1.



**Figure 1 – MY 2018 Ford F-150 Road Load Force**

119.   Ford has used the same road load force curves for the 2020 Ranger and the 2019-2020 F-150 as were used for the 2019 Ranger and 2018 F-150 shown in Table 2.

**Table 3 - Target Coefficients (A, B, and C) from EPA Database for Later Model Ford Trucks**

| Target Coefficients | Ford Ranger | Ford F-150 | |
|---|---|---|---|
| | MY 2020 From EPA Database | MY 2019 From EPA Database | MY 2020 From EPA Database |
| A (lbf) | 31.540 | 26.570 | 26.570 |
| B (lbf/mph) | 0.29320 | 0.05130 | 0.05130 |
| C (lbf/mph^2) | 0.03433 | 0.03385 | 0.03385 |

120.   The coefficients Ford supplied to the EPA underestimate the force acting on the truck. This underestimation of force yields the over estimation of fuel economy. In the speed ranges where the road load has the greatest effect on overall

engine load, road load forces are some 20-35% higher than those values reported to the EPA.

121.   The Ranger measured road load model is some 5-8% higher in those same speed ranges, see Figure 2.



**Figure 2 – MY 2019 Ford Ranger Road Load Drag Force**

122.   Fuel economy was quantified on both the FTP-75 and HWFET cycles in strict accordance with the federal regulations by accounting for both the fuel properties and the carbon-containing emissions from the test cycles. Testing was performed using Tier 2 gasoline, again as prescribed by regulations and as presented in the EPA fuel economy database. The fuel economy values calculated from FTP-75 and HWFET results were used to calculate label fuel economy using the derived

5-cycle method specified in 40 CFR § 600.115-11[30] and shown in the equations below:

$$City\ FE = \frac{1}{City\ Intercept + \frac{City Slope}{FPT\ FE}}$$

And for highway fuel efficiency;

$$Highway\ FE = \frac{1}{Highway\ Intercept + \frac{Highway\ Slope}{HWFET\ FE}}$$

123.   The respective slopes and intercepts are created from a regression of fuel economies across multiple vehicles.   These values are periodically published by the EPA Administrator. The coefficients for the model years corresponding to the trucks tested are shown in Table 4.

**Table 4 Current Derived 5-cycle Coefficients.  Source CD-15-15**

|  | Coefficients of Model Year 2017 and Later |
|---|---|
| City Intercept | 0.004091 |
| City Slope | 1.1601 |
| Highway Intercept | 0.003191 |
| Highway Slope | 1.2945 |

---

[30] Current fuel economy regulations require that every manufacturer test their vehicle fuel economy using the same 5 test cycles used for emissions testing (FTP-75, HWFET, US06, SC03, and Cold CO). A complex calculation is used based on the results of each of those tests to determine the "City" and "Highway" fuel economy to be used on the Monroney label. If the emissions test vehicle used for emissions certification passes a "litmus test," the EPA allows a "derived 5 cycle" fuel economy calculation that is based on the results of two tests only: the FTP-75 and HWFET. The purpose of this litmus test is to reduce the number of total tests manufacturers must perform to test for fuel economy. Because the 2019 Ford Ranger and 2018 Ford F-150 both pass the litmus test in their certification applications, the "derived 5 cycle" calculation is used.

124.   The calculated fuel economies obtained from testing are compared to the fuel economies presented to the EPA in the application for certification and each vehicle's Monroney label in Table 5.

**Table 5 - Fuel Economy Comparison**

|  | Ford F-150 | | | Ford Ranger | | |
|---|---|---|---|---|---|---|
|  | FE Measured | FE EPA App | FE Monroney | FE Measured | FE EPA App | FE Monroney |
| City (mpg) | 17.7 | 19.6 | 20 | 18.3 | 20.0 | 20 |
| Highway (mpg) | 22.7 | 26.6 | 26 | 23.4 | 25.0 | 25 |
| Combined (mpg) | 20.0 | 22.8 | 22 | 20.6 | 22.3 | 22 |

125.   For the Ford F-150, if the measured fuel economy values are rounded to the nearest whole number, as prescribed for Monroney labeling calculations, the resulting city fuel economy label would be 18 mpg for city driving, 23 mph for highway driving, and 20 mph combined. Compared to the EPA label, this represents a difference in fuel economy of 2 mpg for the city (10%), 3 mpg highway (12%), and 2 mpg combined (9%). The certification application states a full useful life of 150,000 miles.   Over this lifetime mileage, there will be an additional 833 gallons consumed for city driving, 752 gallons for highway driving, and 682 gallons combined. Based on the current national average fuel price of $2.79, this would represent an added lifetime fuel cost of $2,324, $2,098, and $1,903 for city, highway, and combined, respectively.

126.   For the Ford Ranger, if the measured fuel economy values are rounded to the nearest whole number, as prescribed for Monroney labeling calculations, the

resulting city fuel economy label would be 18 mpg for city driving, 23 mph for highway driving, and 21 mph combined. Compared to the EPA label, this represents a loss in fuel economy of 2 mpg for the city (10%), 2 mpg highway (8%), and 1 mpg combined (5%). The certification application states a full useful life of 150,000 miles.   Over this lifetime mileage, there will be an additional 833 gallons for city driving, 522 gallons for highway driving, and 325 gallons combined. Based on the current national average fuel price of $2.79, this would represent an added lifetime fuel cost of $2,324, $1,456, and $907 for city, highway, and combined, respectively.

127.   The difference in fuel consumption and money spent over the 150,000 mile life of the vehicles is summarized in Table 5 below.

**Table 6 – Lifetime Additional Fuel Consumed and Money Spend on Fuel Based on Actual Testing Compared to EPA Reported Valued**

|  | Ford F-150 | | Ford Ranger | |
|---|---|---|---|---|
|  | Gallons | $ | Gallons | $ |
| City (mpg) | 833 | $2,324 | 833 | $2,324 |
| Highway (mpg) | 752 | $2,098 | 522 | $1,456 |
| Combined (mpg) | 682 | $1,903 | 325 | $907 |

128.   By cheating in the certification testing, Ford made its F-150 trucks more appealing and competitive in the marketplace, to the point of being named "best in class" for some F-150's and driving up sales and profits.

## H.     Ford's History of Cheating

129.   Ford has a long history of emissions cheating.  The recent Volkswagen emissions cheating debacle is definitely not the first.  In 1973, Ford and Volkswagen were caught in the EPA's first investigation into emission cheating devices.

130.   Ford was caught again in 1998, using a cheat device in 60,000 Econoline vans, which resulted in a multi-million-dollar settlement with the EPA.[31]

131.   Ford was caught just last year, cheating on emissions certification for over 500,000 heavy-duty diesel trucks for which Ford was sued and a motion to dismiss was denied in material respects.

132.   Ford is increasingly misrepresenting the fuel efficiency of its vehicles, which is a more indirect way of cheating on emissions requirements.  Through computer modeling, Ford constructs a fuel efficiency for each vehicle that does not exist in the real world.

133.   Ford over-stated the fuel efficiency of its Ford Fusion and C-MAX hybrid vehicles and was sued for it.  As a result, "[i]n 2013 and 2014, it lowered the gas mileage ratings on several hybrid cars by one to seven miles per gallon."[32]

---

[31] Exhibit 12, Ryan Beene, *VW Emissions 'Defeat Device' Isn't the First*, AutoWeek (Sep. 24, 2015), https://autoweek.com/article/car-news/vw-emissions-defeat-device-isnt-first (last visited Aug. 11, 2020).

[32] Exhibit 2, *supra* fn. 2.

**I.    Ford advertising for the Ranger emphasizes fuel economy.**

134.   Even after Ford employees had come forward about the cheating, Ford's media center touted the 2019 Ranger truck as having amazing performance without compromise, and the claims of its fuel efficiency are front and center:



- With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined, 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America

December 11, 2018 Ford Media Press Release titled, "*Adventure Further: All-New Ford Ranger Rated Most Fuel-Efficient Gas-Powered Midsize Pickup in America.*"[33]

---

[33] Exhibit 4, *supra* fn. 4.

135.   Ford's claim of most fuel efficient in its class is repeated in sales brochures for the 2019 Ranger[34]:



**J.     Ford promotes the F-150 as best in class for fuel economy or publishes MPG estimates to beat its competition.**

136.   The F-150 is the best-selling vehicle in the United States and has been for decades.  In 2018, Ford sold more than 1.075 million F series vehicles globally, a sale every 29.3 seconds.  As Ford executive Jim Farley noted, "But it's our F-

---

[34] Exhibit 13, 2019 Ford Ranger brochure.

Series juggernaut that leads the world in sales, capability and smart technology, setting the bar others follow."[35]

137. To stimulate F-150 sales and maintain its lead over competitors like the Dodge Ram, Ford announced that the 2018 Ford F-150 would be best in class for fuel economy and/or published inflated MPG estimates.

138. As early as August 2017, based on information from Ford, consumers were told to expect "better fuel economy" in the 2018 F-150.

139. The Monroney sticker for a 2018 F-150 2.7 V6[36] lists the MPG as follows:

---

[35] Exhibit 17, *Ford Surpasses 1 Million Truck Sales in 2018*, Ford Media Center (Jan. 12, 2019), https://media.ford.com/content/fordmedia/fna/us/en/news/2019/01/12/ford-surpasses-1-million-truck-sales-in-2018.html (last visited Aug. 11, 2020).

[36] Exhibit 18, Monroney sticker for 2018 F-150 2.7 V6.



140.  An August 10, 2017 cnet.com article "*2018 Ford F-150 touts best-in-class towing, payload, fuel economy*" states:

> Buyers have a choice of *five* different engines. The base offering is a 290-horsepower 3.3-liter V6, followed by a 325-hp 2.7-liter turbo V6. In the middle of the range is the 5.0-liter V8 with 395 horsepower. The top two engine choices are both 3.5-liter turbocharged V6s -- one putting out 375 horsepower, and the other putting out 450.[37]

---

37 Exhibit 19, Andrew Krok, *2018 Ford F-150 touts best-in-class towing, payload, fuel economy*, Road Show (Aug. 10, 2017), https://www.cnet.com/roadshow/news/2018-ford-f-150-touts-best-in-class-towing-payload-fuel-economy/ (last visited Aug. 11, 2020) (emphasis in original).

141.   The cnet.com article emphasizes fuel economy:

> With these new engines comes better fuel economy. And once again, Ford gets to claim best-in-class, thanks to the 2.7-liter V6, which achieves 20 mpg city and 26 mpg highway in 2WD. The 3.3-liter V6 isn't very far behind it at 19 mpg city and 25 mpg highway. The thirstiest engine of the bunch is the high-output 3.5-liter turbo V6, which still isn't too bad at 15 mpg city and 18 mpg highway.[38]

142.   The 2018 F-150 brochure[39] lists the estimated fuel economy for the various types of 150s:

---

[38] *Id.*
[39] Exhibit 20, 2018 Ford F-150 brochure.



## ALL-NEW
## 3.3L Ti-VCT V6

The all-new, standard F-150 powerplant for 2018 delivers where it matters most: higher towing capability, more payload capacity, and improved fuel efficiency.[2] That's a clean sweep in any truck buyer's ledger. Plus, a higher compression ratio and higher max. combustion peak pressure help surpass previous horsepower and torque numbers. A dual-injection system features both direct injection and port fuel injection to improve power output and efficiency over a wide variety of engine loads.

A 6-speed SelectShift automatic transmission is paired with the 3.3L Ti-VCT engine.

| | |
|---|---|
| Horsepower | 290 @ 6,500 rpm |
| Torque | 265 lb.-ft. @ 4,000 rpm |
| EPA-estimated ratings[5] | 19 city/25 hwy/22 combined mpg |
| Max. payload capacity[6] | 1,990 lbs. |
| Max. towing capacity[5] | 7,700 lbs. |



## ENHANCED
## 2.7L ECOBOOST®

t    Named one of "Our 10 Favorite Gas
Burners" by *Car and Driver*. And that
was before the upgrades increased
torque to 400 lb.-ft. 2nd-generation
updates to this twin turbo[3] include
a new dual-injection system that
features both direct injection and
port fuel injection. Two injectors per
cylinder – one mounted in the intake
port and another inside the cylinder –
improve power output and efficiency.

Strength and durability come from
compacted graphite iron (CGI)
that forms the upper engine block
and cylinders. New for 2018, the
2.7L[3] is paired with the 10-speed
SelectShift automatic transmission
for exceptional driveability.

| |
|---|
| 325 @ 5,000 rpm |
| 400 lb.-ft. @ 2,750 rpm |
| 20 city/26 hwy/22 combined mpg |
| 2,470 lbs. |
| 9,100 lbs. |



## ENHANCED
## 5.0L Ti-VCT V8

Horsepower and torque – increased. Fuel efficiency – improved. The trusted 5.0L V8 engine[3] – better than ever. A new dual-injection system increases compression ratio to 12:1. Upgraded main and connecting rod bearings provide greater durability. And, new for 2018, the V8 is paired with the 10-speed SelectShift automatic transmission for the first time. "The 5.0L ... roars with a burly truck V8 note," says *Motor Trend*.

An available, class-exclusive CNG/ Propane Gaseous Engine Prep Package can ready your V8-equipped F-150 to be upfit for compressed natural gas (CNG), propane autogas, or as a bi-fuel vehicle with the ability to switch between CNG or propane and gasoline.[4]

| |
|---|
| 395 @ 5,750 rpm |
| 400 lb.-ft. @ 4,500 rpm |
| 17 city/23 hwy/19 combined mpg |
| 3,270 lbs. |
| 11,600 lbs. |



## 2ND-GEN
# 3.5L ECOBOOST

All-new for the 2017 model year, the 3.5L EcoBoost[3] soldiers on for 2018 with a class-best 470 lb.-ft. of torque, along with 375 horsepower. Paired with the 10-speed SelectShift automatic transmission, engine torque is readily available across the speed range for instant acceleration and exceptional low-end and peak performance. Exactly what's needed for hauling heavy loads and towing heavy trailers.

A roller-finger follower valvetrain features durable intake and exhaust valves, as well as hydraulic valve-lash adjusters that optimize engine durability.

| |
|---|
| 375 @ 5,000 rpm |
| 470 lb.-ft. @ 3,500 rpm |
| 18 city/25 hwy/21 combined mpg |
| 3,230 lbs. |
| 13,200 lbs. |



## ALL-NEW 3.0L POWER STROKE DIESEL

As the first-ever diesel engine in Ford F-150, the 3.0L Power Stroke® Turbo Diesel³ delivers 440 lb.-ft. of diesel torque and 250 diesel horsepower – both best in class. It's also paired with the 10-speed SelectShift automatic transmission to put all its usable low-end engine torque to good use.

With the transmission's 10-speed architecture, and the engine's peak torque arriving at a low 1,750 rpm, the diesel powertrain is an exceptional choice for towing – where strong torque delivery throughout the rpm range is exactly what you need.

| |
|---|
| 250 @ 3,250 rpm |
| 440 lb.-ft. @ 1,750 rpm |
| 22 city/30 hwy/25 combined mpg |
| 1,940 lbs. |
| 11,400 lbs. |

**K.      Economic harm**

143.    As a result of Defendant's unfair, deceptive, and/or fraudulent business practices, Plaintiffs did not receive the fuel efficiency that was advertised and will incur increased fuel costs over the life of their vehicle.  Had Ford told the truth, that it was cheating on its coastdown testing, Plaintiffs would not have bought their vehicle or would have paid substantially less.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

**A.      Discovery rule tolling**

144.    Class members had no way of knowing about Ford's deception with respect to the Coastdown Cheating Vehicles' performance in real-world driving. To be sure, Ford continues to market the Coastdown Cheating Vehicles, including the 2019 Ranger and 2019 F-150, with false representations of its fuel efficiency.

145.    Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered through the exercise of reasonable diligence that Ford was concealing the conduct complained of herein and misrepresenting the company's true position with respect to the performance of the Coastdown Cheating Vehicles.

146.    Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have

disclosed that Ford had concealed information about the true emissions of the Coastdown Cheating Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs and other Class members have disclosed that Ford valued profits over truthful marketing and compliance with the law.

147.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Coastdown Cheating Vehicles.

## B.   Fraudulent concealment tolling

148.   All applicable statutes of limitation have also been tolled by Ford's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

149.   Instead of disclosing its fuel economy and emissions testing scheme, Ford continues to falsely represent that the Coastdown Cheating Vehicles have higher fuel economy and lower emissions than advertised.

## C.   Estoppel

150.   Ford was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Coastdown Cheating Vehicles' fuel efficiency and emissions.

151.   Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fuel efficiency and emissions in the Coastdown Cheating Vehicles and continues to do so in its advertising and brochures for continued sale of these vehicles.

152.   Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS DEFINITIONS

153.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> **<u>Nationwide Class</u>**
> All persons who purchased or leased a Ford vehicle whose published EPA fuel economy ratings, as printed on the vehicles' window sticker, were more than the fuel economy rating produced by a properly conducted applicable federal mileage test. The vehicles in the Class include but are not limited to the model year 2019-2020 Ford Ranger and the 2018-2020 Ford F-150.

### Arizona Subclass
All members of the Nationwide Class who are residents of Arizona or purchased or leased their Coastdown Cheating Vehicle in Arizona.

### Florida Subclass
All members of the Nationwide Class who are residents of Florida or purchased or leased their Coastdown Cheating Vehicle in Florida.

### Hawaii Subclass
All members of the Nationwide Class who are residents of Hawaii or purchased or leased their Coastdown Cheating Vehicle in Hawaii.

### Massachusetts Subclass
All members of the Nationwide Class who are residents of Massachusetts or purchased or leased their Coastdown Cheating Vehicle in Massachusetts.

### Oregon Subclass
All members of the Nationwide Class who are residents of Oregon or purchased or leased their Coastdown Cheating Vehicle in Oregon.

154. The class is likely to also include other vehicles, as well as other model year vehicles. Plaintiffs reserve the right to amend the proposed class after additional information is received from Ford Motor Company in discovery.

155. Excluded from the Class are individuals who have personal injury claims resulting from the high emissions in the Coastdown Cheating Vehicles. Also excluded from the Class are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' counsel.

156.   Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

157.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

158.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

159.   <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are in excess of an estimated 1,000,000 or more vehicles in the Class. The precise number of Class members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

160.   <u>Commonality and Predominance</u>: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

- 67 -

a)  Whether Ford engaged in the conduct alleged herein;

b)  Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed Coastdown Cheating Vehicles into the stream of commerce in the United States;

c)  Whether Ford provided false information to consumers regarding the fuel efficiency and emissions of the Coastdown Cheating Vehicles;

d)  Whether Ford provided false information to the EPA regarding the fuel efficiency and emissions of the Coastdown Cheating Vehicles;

e)  Whether Ford knew, and for how long, that the testing certifying the fuel efficiency and emissions of the Coastdown Cheating Vehicles was tainted by inaccurate information;

f)  Whether Ford intentionally designed, manufactured, marketed, and distributed Coastdown Cheating Vehicles with misleading fuel efficiency and emissions ratings;

g)  Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

h)  Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

161.  Typicality: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

162.  Adequacy: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have

retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. Plaintiffs' counsel have extensive experience in emissions cases. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

163.   <u>Superiority</u>: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Classes to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLASS ALLEGATIONS

**A.**     **Claims brought on behalf of the Arizona Subclass**

### COUNT 1

### VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
### (ARIZONA REV. STAT. § 44-1521 *et seq.*)

164.   Plaintiff Ronald Ceremello ("Arizona Plaintiff") Arizona Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

165.   This claim is brought by Arizona Plaintiffs on behalf of the Arizona Subclass.

166.   Ford, Plaintiffs, and Arizona Class members are "persons" within the meaning of the Arizona CFA, ARIZ. REV. STAT. § 44-1521(6).

167.   Each Coastdown Cheating Vehicle at issue is "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

168.   The Arizona Consumer Fraud Act (Arizona CFA) provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

169. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

170. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

171. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Arizona Plaintiffs and the Arizona Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

172. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Arizona Plaintiffs and the Arizona Subclass.

173. Ford knew or should have known that its conduct violated the Arizona CFA.

- 71 -

174. Ford owed Arizona Plaintiffs and the Arizona Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.    Intentionally concealed the foregoing from Arizona Plaintiffs and the Arizona Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Arizona Plaintiffs and the Arizona Subclass that contradicted these representations.

175. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Arizona Plaintiffs and the Arizona Subclass.

176. Arizona Plaintiffs and the Arizona Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Arizona Plaintiffs and the Arizona Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Arizona CFA.

177.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Arizona CFA.

178.   As a direct and proximate result of Ford's violations of the Arizona CFA, Arizona Plaintiffs and the Arizona Subclass have suffered injury-in-fact and/or actual damage.

179.   Ford's violations present a continuing risk to Arizona Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

180.   Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

181.   Arizona Plaintiffs seek monetary relief against Ford in an amount to be determined at trial. Arizona Plaintiffs and the Arizona Subclass also seek punitive damages because Ford engaged in aggravated and outrageous conduct with an evil mind.

182.   Arizona Plaintiffs and the Arizona Subclass also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT 2

## BREACH OF CONTRACT
## (BASED ON ARIZONA LAW)

183.   Arizona Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

184.   This claim is brought by Arizona Plaintiffs on behalf of the Arizona Subclass.

185.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Arizona Plaintiffs and the Arizona Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Arizona Plaintiffs and the Arizona Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Arizona Plaintiffs and the Arizona Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

186.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Arizona Plaintiffs and the Arizona Subclass

defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

187.   As a direct and proximate result of Ford's breach of contract, Arizona Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 3

## BREACH OF EXPRESS WARRANTY
### (ARIZ. REV. STAT. § 47-2313, *ET SEQ.*)

188.   Arizona Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

189.   This claim is brought by Arizona Plaintiffs on behalf of the Arizona Subclass.

190.   Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Ariz. Rev. Stat. § 47-2104(A).

191.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover

"defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

192.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

193.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

194.   These affirmations and promises were part of the basis of the bargain that was reached when Arizona Plaintiffs and the other Arizona Subclass members purchased or leased the Coastdown Cheating Vehicles.

195.   Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

196.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

197.   Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Arizona Plaintiffs and the Arizona Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

198.   Accordingly, recovery by the Arizona Plaintiffs and the Arizona Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Arizona Plaintiffs, individually and on behalf of the other Arizona Subclass members, seek all remedies as allowed by law.

199.   Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Arizona Plaintiffs and the Arizona Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

200.   Finally, due to Ford's breach of warranty as set forth herein, Arizona Plaintiffs and the Arizona Subclass assert as an additional and/or alternative remedy, as set forth in Ariz. Rev. Stat. § 47-2711, the revocation of acceptance of the goods,

and the return to Arizona Plaintiffs and the Arizona Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned for such other incidental and consequential damages as allowed under Ariz. Rev. Stat. §§ 47-2711 and 47-2608.

201.   Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

202.   As a direct and proximate result of Ford's breach of express warranties, Arizona Plaintiffs and the Arizona Subclass have been damaged in an amount to be determined at trial.

## COUNT 4

## FRAUDULENT CONCEALMENT
## (BASED ON ARIZONA LAW)

203.   Arizona Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

204.   This claim is brought by Arizona Plaintiffs on behalf of the Arizona Subclass.

205.   Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these

vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Arizona Plaintiffs and the Arizona Subclass information that is highly relevant and material to their purchasing decision.

206.   The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

207.   Ford further affirmatively misrepresented to Arizona Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

208.   Ford knew these representations were false when made.

209.   The Coastdown Cheating Vehicles purchased or leased by Arizona Plaintiffs and the Arizona Subclass were, in fact, defective, with reduced fuel efficiency.

210.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Arizona Plaintiffs and the

Arizona Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

211. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

212. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Arizona Plaintiffs and the Arizona Subclass did not know of these facts and Ford actively concealed these facts from Arizona Plaintiffs and the Arizona Subclass.

213. Arizona Plaintiffs and the Arizona Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Arizona Plaintiffs and the Arizona Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Arizona Plaintiffs and the Arizona Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

214. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and

sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Arizona Plaintiffs and the Arizona Subclass placed in its representations.

215.   Ford's false representations  and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Arizona Plaintiffs and the Arizona Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

216.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Arizona Plaintiffs and the Arizona Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth

above regarding the actual mileage of its vehicles. Having volunteered to provide information to Arizona Plaintiffs and the Arizona Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Arizona Plaintiffs and the Arizona Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Arizona Plaintiffs and the Arizona Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

217. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Arizona Plaintiffs and the Arizona Subclass.

218. Ford has still not made full and adequate disclosures and continues to defraud Arizona Plaintiffs and the Arizona Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

219.    Arizona Plaintiffs and the Arizona Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Arizona Plaintiffs' and the Arizona Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Arizona Plaintiffs, or Arizona Subclass members.

220.    Because of the concealment and/or suppression of the facts, Arizona Plaintiffs and the Arizona Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Arizona Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

221.    Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Arizona Plaintiffs and the Arizona Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

222. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Arizona Plaintiffs' and the Arizona Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 5

## NEGLIGENT MISREPRESENTATION
## (BASED ON ARIZONA LAW)

223. Arizona Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

224. This claim is brought by the Arizona Plaintiffs on behalf of the Arizona Subclass.

225. Defendant made fuel economy representations to Arizona Plaintiffs and members of the Class that were not true.

226. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Arizona Plaintiffs and Arizona Subclass members rely on these misrepresentations.

227. Arizona Plaintiffs reasonably relied on Defendant's representations and as a result Arizona Plaintiffs and Arizona Subclass members were harmed.

## COUNT 6

## UNJUST ENRICHMENT
## (BASED ON ARIZONA LAW)

228.   Arizona Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

229.   This claim is brought by the Arizona Plaintiffs on behalf of the Arizona Subclass.

230.   Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Arizona Plaintiffs and the Arizona Subclass.

231.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Arizona Plaintiffs and other Arizona Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

232.   Arizona Plaintiffs, therefore, seek an order requiring Ford to make restitution to them and other members of the Arizona Subclass.

**B.    Claims Brought on Behalf of the Florida Subclass**

## COUNT 7

## VIOLATIONS OF THE FLORIDA UNFAIR AND
## DECEPTIVE TRADE PRACTICES ACT
## (FLA. STAT. § 501.201 *ET SEQ.*)

233.   Plaintiff Randall Maingot ("Florida Plaintiff") incorporate by reference all preceding allegations as though fully set forth herein.

234.   Florida Plaintiff bring this Count on behalf of the Florida Subclass.

235.   Florida Plaintiff and the Florida Subclass members are "consumers" within the meaning of Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA"), FLA. STAT. § 501.203(7).

236.   Defendant engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

237.   Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1). Defendant participated in unfair and deceptive trade practices that violated the Florida UDTPA as described herein.  Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in FLA. STAT. § 501.204(1).  Ford's conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and is likely to mislead consumers.

238.   In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud,

misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

239.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Florida Plaintiff and the Florida Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

240.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Florida Plaintiff and the Florida Subclass.

241.   Ford knew or should have known that its conduct violated the Florida UDTPA.

242.   Ford owed Florida Plaintiff and the Florida Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

> a.   Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;
>
> b.   Intentionally concealed the foregoing from Florida Plaintiff and the Florida Subclass; and/or

c.   Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Florida Plaintiff and the Florida Subclass that contradicted these representations.

243.   Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Florida Plaintiff and the Florida Subclass.

244.   Florida Plaintiff and the Florida Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Florida Plaintiff and the Florida Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Florida UDTPA.

245.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Florida UDTPA. As a direct and proximate result of Ford's violations of the Florida UDTPA, Florida Plaintiff and the Florida Subclass have suffered injury-in-fact and/or actual damage.

246.   Ford's violations present a continuing risk to Florida Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

247.   Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

248.   Accordingly, the Defendant is liable to Florida Plaintiff and the Florida Subclass for damages in an amount to be proven at trial.

249.   Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 8

## BREACH OF CONTRACT
## (BASED ON FLORIDA LAW)

250.   Florida Plaintiff incorporate by reference all paragraphs as though fully set forth herein.

251.   This claim is brought by Florida Plaintiff on behalf of the Florida Subclass.

252.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Florida Plaintiff and the Florida Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Florida Plaintiff and the Florida Subclass would

not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Florida Plaintiff and the Florida Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

253. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Florida Plaintiff and the Florida Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

254. As a direct and proximate result of Ford's breach of contract, Florida Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 9

## BREACH OF EXPRESS WARRANTY
## (FLA. STAT. § 672.313)

255.   Florida Plaintiff incorporate by reference all paragraphs as though fully set forth herein.

256.   This claim is brought by Florida Plaintiff on behalf of the Florida Subclass.

257.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

258.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

259.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

260.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

261.   These affirmations and promises were part of the basis of the bargain that was reached when Florida Plaintiff and the other Florida Subclass members purchased or leased the Coastdown Cheating Vehicles.

262.   Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

263.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

264.   Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Florida Plaintiff and the Florida Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

265.   Accordingly, recovery by the Florida Plaintiff and the Florida Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing

defect, and Florida Plaintiff, individually and on behalf of the other Florida Subclass members, seek all remedies as allowed by law.

266.   Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Florida Plaintiff and the Florida Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

267.   Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

268.   As a direct and proximate result of Ford's breach of express warranties, Florida Plaintiff and the Florida Subclass have been damaged in an amount to be determined at trial.

## COUNT 10

## FRAUDULENT CONCEALMENT
## (BASED ON FLORIDA LAW)

269.   Florida Plaintiff incorporate by reference all paragraphs as though fully set forth herein.

270.   This claim is brought by Florida Plaintiff on behalf of the Florida Subclass.

271.   Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Florida Plaintiff and the Florida Subclass information that is highly relevant to their purchasing decision.

272.   The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

273.   Ford further affirmatively misrepresented to Florida Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

274.   Ford knew these representations were false when made.

275.   The Coastdown Cheating Vehicles purchased or leased by Florida Plaintiff and the Florida Subclass were, in fact, defective, with reduced fuel efficiency.

276.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Florida Plaintiff and the Florida Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

277.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

278.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Florida Plaintiff and the Florida Subclass did not know of these facts and Ford actively concealed these facts from Florida Plaintiff and the Florida Subclass.

279.   Florida Plaintiff and the Florida Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers Florida Plaintiff and the Florida Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Florida Plaintiff and the Florida Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

280.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Florida Plaintiff and the Florida Subclass placed in its representations.

281.   Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Florida Plaintiff and the Florida Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

282.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is

far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Florida Plaintiff and the Florida Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Florida Plaintiff and the Florida Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Florida Plaintiff and the Florida Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Florida Plaintiff and the Florida Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

283.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Florida Plaintiff and the Florida Subclass.

284.   Ford has still not made full and adequate disclosures and continues to defraud Florida Plaintiff and the Florida Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

285.   Florida Plaintiff and the Florida Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Florida Plaintiff's and the Florida Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Florida Plaintiff, or Florida Subclass members.

286.   Because of the concealment and/or suppression of the facts, Florida Plaintiff and the Florida Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was

represented by Ford. Had they been aware of the true facts, Florida Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

287.   Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Florida Plaintiff and the Florida Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

288.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Florida Plaintiff's and the Florida Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 11

## NEGLIGENT MISREPRESENTATION
## (BASED ON FLORIDA LAW)

289.   Florida Plaintiff reallege and incorporate by reference all paragraphs alleged herein.

290.   This claim is brought by the Florida Plaintiff on behalf of the Florida Subclass.

291.   Defendant made fuel economy representations to Florida Plaintiff and members of the Class that were not true.

292.   Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Florida Plaintiff and Florida Subclass members rely on these misrepresentations.

293.   Florida Plaintiff reasonably relied on Defendant's representations and as a result Florida Plaintiff and Florida Subclass members were harmed.

## COUNT 12

## UNJUST ENRICHMENT
## (BASED ON FLORIDA LAW)

294.   Florida Plaintiff reallege and incorporate by reference all paragraphs alleged herein.

295.   This claim is brought by the Florida Plaintiff on behalf of the Florida Subclass.

296.   Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Florida Plaintiff and the Florida Subclass.

297.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Florida Plaintiff and other Florida Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

298.  Florida Plaintiff, therefore, seek an order requiring Ford to make restitution to them and other members of the Florida Subclass.

**C.      Claims brought on behalf of the Hawaii Subclass**

### COUNT 13

### VIOLATION OF THE HAWAII ACT § 480-2(A)
### (HAW. REV. STAT. § 480 *et seq.*)

299.  Plaintiff George Andrew Rayne ("Hawaii Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

300.  This claim is brought by Hawaii Plaintiff on behalf of the Hawaii Subclass.

301.  HAWAII REV. STAT. § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

302.  Ford is a "person" under HAW. REV. STAT. § 480-1.

303.  Hawaii Plaintiff and Hawaii Class members are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who purchased or leased the Coastdown Cheating Vehicles at issue.

304.  In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel

economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

305.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

306.   Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Hawaii Plaintiff and the Hawaii Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

307.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Hawaii Plaintiff and the Hawaii Subclass.

308.   Ford knew or should have known that its conduct violated the Hawaii UDA.

309.   Ford owed Hawaii Plaintiff and the Hawaii Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.    Intentionally concealed the foregoing from Hawaii Plaintiff and the Hawaii Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Hawaii Plaintiff and the Hawaii Subclass that contradicted these representations.

310.   Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Hawaii Plaintiff and the Hawaii Subclass.

311.   Hawaii Plaintiff and the Hawaii Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Hawaii Plaintiff and the Hawaii Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Hawaii UDA.

312.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Hawaii UDA.

313.   As a direct and proximate result of Ford's violations of the Hawaii UDA, Hawaii Plaintiff and the Hawaii Subclass have suffered injury-in-fact and/or actual damage.

314.   Ford's violations present a continuing risk to Hawaii Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

315.   Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

316.   Pursuant to HAW. REV. STAT. § 480-13, Hawaii Plaintiff and Hawaii Subclass members seek monetary relief against Ford measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

317.   Under HAW. REV. STAT. § 480-13.5, Hawaii Plaintiff and Hawaii Subclass members seek an additional award against Ford of up to $10,000 for each violation directed at a Hawaii elder. Ford knew or should have known that its conduct was directed to one or more Plaintiffs who are elders. Ford's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the

health or welfare of the elder. Plaintiffs who are elders are substantially more vulnerable to Ford's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from Ford's conduct.

318.   Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 14

## BREACH OF CONTRACT
## (BASED ON HAWAII LAW)

319.   Hawaii Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

320.   This claim is brought by Hawaii Plaintiff on behalf of the Hawaii Subclass.

321.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Hawaii Plaintiff and the Hawaii Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Hawaii Plaintiff and the Hawaii Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not

contain the reduced mileage. Accordingly, Hawaii Plaintiff and the Hawaii Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

322.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Hawaii Plaintiff and the Hawaii Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

323.   As a direct and proximate result of Ford's breach of contract, Hawaii Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 15

### BREACH OF EXPRESS WARRANTY
### (HI REV. STAT. §§ 490:2-313 & 490:2A-519)

324.   Hawaii Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

325.   This claim is brought by Hawaii Plaintiff on behalf of the Hawaii Subclass.

326.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

327.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

328.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

329.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

330.   These affirmations and promises were part of the basis of the bargain that was reached when Hawaii Plaintiff and the other Hawaii Subclass members purchased or leased the Coastdown Cheating Vehicles.

331. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

332. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

333. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Hawaii Plaintiff and the Hawaii Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

334. Accordingly, recovery by the Hawaii Plaintiff and the Hawaii Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Hawaii Plaintiff, individually and on behalf of the other Hawaii Subclass members, seek all remedies as allowed by law.

335. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently

concealed material facts regarding the Coastdown Cheating Vehicles. Hawaii Plaintiff and the Hawaii Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

336. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

337. As a direct and proximate result of Ford's breach of express warranties, Hawaii Plaintiff and the Hawaii Subclass have been damaged in an amount to be determined at trial.

## COUNT 16

## FRAUDULENT CONCEALMENT
## (BASED ON HAWAII LAW)

338. Hawaii Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

339. This claim is brought by Hawaii Plaintiff on behalf of the Hawaii Subclass.

340. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard

for the truth and denied Hawaii Plaintiff and the Hawaii Subclass information that is highly relevant and material to their purchasing decision.

341.   The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

342.   Ford further affirmatively misrepresented to Hawaii Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

343.   Ford knew these representations were false when made.

344.   The Coastdown Cheating Vehicles purchased or leased by Hawaii Plaintiff and the Hawaii Subclass were, in fact, defective, with reduced fuel efficiency.

345.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Hawaii Plaintiff and the Hawaii Subclass relied on Ford's material representations or omissions of fact that

the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

346.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

347.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Hawaii Plaintiff and the Hawaii Subclass did not know of these facts and Ford actively concealed these facts from Hawaii Plaintiff and the Hawaii Subclass.

348.   Hawaii Plaintiff and the Hawaii Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Hawaii Plaintiff and the Hawaii Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Hawaii Plaintiff and the Hawaii Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

349.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions

regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Hawaii Plaintiff and the Hawaii Subclass placed in its representations.

350.   Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Hawaii Plaintiff and the Hawaii Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

351.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Hawaii Plaintiff and the Hawaii Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide

information to Hawaii Plaintiff and the Hawaii Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Hawaii Plaintiff and the Hawaii Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Hawaii Plaintiff and the Hawaii Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

352.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Hawaii Plaintiff and the Hawaii Subclass.

353.   Ford has still not made full and adequate disclosures and continues to defraud Hawaii Plaintiff and the Hawaii Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

354.   Hawaii Plaintiff and the Hawaii Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they

had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Hawaii Plaintiff's and the Hawaii Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Hawaii Plaintiff, or Hawaii Subclass members.

355. Because of the concealment and/or suppression of the facts, Hawaii Plaintiff and the Hawaii Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Hawaii Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

356. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Hawaii Plaintiff and the Hawaii Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

357. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Hawaii Plaintiff's and the Hawaii Subclass's rights and the representations that Ford made to them in

order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 17

## NEGLIGENT MISREPRESENTATION
## (BASED ON HAWAII LAW)

358.   Hawaii Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

359.   This claim is brought by the Hawaii Plaintiff on behalf of the Hawaii Subclass.

360.   Defendant made fuel economy representations to Hawaii Plaintiff and members of the Class that were not true.

361.   Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Hawaii Plaintiff and Hawaii Subclass members rely on these misrepresentations.

362.   Hawaii Plaintiff reasonably relied on Defendant's representations and as a result Hawaii Plaintiff and Hawaii Subclass members were harmed.

## COUNT 18

## UNJUST ENRICHMENT
## (BASED ON HAWAII LAW)

363.   Hawaii Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

364.   This claim is brought by the Hawaii Plaintiff on behalf of the Hawaii Subclass.

365.   Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Hawaii Plaintiff and the Hawaii Subclass.

366.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Hawaii Plaintiff and other Hawaii Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

367.   Hawaii Plaintiff, therefore, seeks an order requiring Ford to make restitution to them and other members of the Hawaii Subclass.

**D.    Claims brought on behalf of the Massachusetts Subclass**

## COUNT 19

### VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A) (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*)

368.   Plaintiff Robert Lovell ("Massachusetts Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

369.   This claim is brought by Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

370.   Defendant is a "person" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

371..   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."   Mass. Gen. Laws ch. 93A, § 2.   Ford participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

372.   In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

373.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

374.   Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Massachusetts Plaintiffs and the Massachusetts Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to

its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

375. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Massachusetts Plaintiffs and the Massachusetts Subclass.

376. Ford knew or should have known that its conduct violated the Massachusetts Act.

377. Ford owed Massachusetts Plaintiffs and the Massachusetts Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from Massachusetts Plaintiffs and the Massachusetts Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Massachusetts Plaintiffs and the Massachusetts Subclass that contradicted these representations.

378. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Massachusetts Plaintiffs and the Massachusetts Subclass.

379. Massachusetts Plaintiffs and the Massachusetts Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Massachusetts Plaintiffs and the Massachusetts Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Massachusetts Act.

380. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Massachusetts Act.

381. As a direct and proximate result of Ford's violations of the Massachusetts Act, Massachusetts Plaintiffs and the Massachusetts Subclass have suffered injury-in-fact and/or actual damage.

382. Ford's violations present a continuing risk to Massachusetts Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

383. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

384.   Pursuant to Mass. Gen. Laws ch. 93A, § 9, Massachusetts Plaintiffs and the Massachusetts Subclass seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and each Massachusetts Subclass member. Because Ford's conduct was committed willfully and knowingly, Massachusetts Plaintiffs are entitled to recover, for each Plaintiff and each Massachusetts Subclass member, up to three times actual damages, but no less than two times actual damages.

385.   Massachusetts Plaintiffs also seek an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees costs, and any other just and proper relief available under the Massachusetts Act.

386.   Massachusetts Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct

387.   On June 20, 2019, Plaintiffs sent a letter complying with MASS. GEN. LAWS CH. 93A, § 9(3) to Ford.

## COUNT 20

## BREACH OF CONTRACT
## (BASED ON MASSACHUSETTS LAW)

388.   Massachusetts Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

389.   This claim is brought by Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

390.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Massachusetts Plaintiff and the Massachusetts Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Massachusetts Plaintiff and the Massachusetts Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Massachusetts Plaintiff and the Massachusetts Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

391.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Massachusetts Plaintiff and the Massachusetts Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable

consumer would expect given the premium paid for these vehicles and the representation made by Ford.

392.   As a direct and proximate result of Ford's breach of contract, Massachusetts Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 21

### BREACH OF EXPRESS WARRANTY
### (MASS. GEN. LAWS CH. 106, § 2-313)

393.   Massachusetts Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

394.   This claim is brought by Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

395.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

396.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the

shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

397.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

398.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

399.   These affirmations and promises were part of the basis of the bargain that was reached when Massachusetts Plaintiff and the other Massachusetts Subclass members purchased or leased the Coastdown Cheating Vehicles.

400.   Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

401.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

402. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Massachusetts Plaintiff and the Massachusetts Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

403. Accordingly, recovery by the Massachusetts Plaintiff and the Massachusetts Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Massachusetts Plaintiff, individually and on behalf of the other Massachusetts Subclass members, seek all remedies as allowed by law.

404. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Massachusetts Plaintiff and the Massachusetts Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

405. Moreover, many of the injuries flowing from the Coastdown Cheating Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure

and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Massachusetts Plaintiff's and the other Massachusetts Subclass members' remedies would be insufficient to make Massachusetts Plaintiff and the other Massachusetts Subclass members whole.

406.   Finally, due to Ford's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in Mass. Gen. Laws Ch. 106, § 2-608, for a revocation of acceptance of the goods, and for a return to Massachusetts Plaintiff and the Massachusetts Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned and for such other incidental and consequential damages as allowed under Mass. Gen. Laws Ch. 106, §§ 2-711 and 2-608.

407.   Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

408.   As a direct and proximate result of Ford's breach of express warranties, Massachusetts Plaintiff and the Massachusetts Subclass have been damaged in an amount to be determined at trial.

## COUNT 22

## FRAUDULENT CONCEALMENT
## (BASED ON MASSACHUSETTS LAW)

409.  Massachusetts Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

410.  This claim is brought by Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

411.  Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Massachusetts Plaintiff and the Massachusetts Subclass information that is highly relevant and material to their purchasing decision.

412.  The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

413.  Ford further affirmatively misrepresented to Massachusetts Plaintiff in advertising and other forms of communication, including standard and uniform

material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

414. Ford knew these representations were false when made.

415. The Coastdown Cheating Vehicles purchased or leased by Massachusetts Plaintiff and the Massachusetts Subclass were, in fact, defective, with reduced fuel efficiency.

416. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Massachusetts Plaintiff and the Massachusetts Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

417. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

418. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Massachusetts Plaintiff and the

Massachusetts Subclass did not know of these facts and Ford actively concealed these facts from Massachusetts Plaintiff and the Massachusetts Subclass.

419.   Massachusetts Plaintiff and the Massachusetts Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Massachusetts Plaintiff and the Massachusetts Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Massachusetts Plaintiff and the Massachusetts Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

420.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Massachusetts Plaintiff and the Massachusetts Subclass placed in its representations.

421.   Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Massachusetts Plaintiff and the

Massachusetts Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

422.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Massachusetts Plaintiff and the Massachusetts Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Massachusetts Plaintiff and the Massachusetts Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Massachusetts Plaintiff and the Massachusetts Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Massachusetts Plaintiff and the

Massachusetts Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

423.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Massachusetts Plaintiff and the Massachusetts Subclass.

424.   Ford has still not made full and adequate disclosures and continues to defraud Massachusetts Plaintiff and the Massachusetts Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

425.   Massachusetts Plaintiff and the Massachusetts Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Massachusetts Plaintiff's and the Massachusetts Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such

facts were not generally known to the public, Massachusetts Plaintiff, or Massachusetts Subclass members.

426. Because of the concealment and/or suppression of the facts, Massachusetts Plaintiff and the Massachusetts Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Massachusetts Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

427. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Massachusetts Plaintiff and the Massachusetts Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

428. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Massachusetts Plaintiff's and the Massachusetts Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 23

## NEGLIGENT MISREPRESENTATION
## (BASED ON MASSACHUSETTS LAW)

429.   Massachusetts Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

430.   This claim is brought by the Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

431.   Defendant made fuel economy representations to Massachusetts Plaintiff and members of the Class that were not true.

432.   Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Massachusetts Plaintiff and Massachusetts Subclass members rely on these misrepresentations.

433.   Massachusetts Plaintiff reasonably relied on Defendant's representations and as a result Massachusetts Plaintiff and Massachusetts Subclass members were harmed.

## COUNT 24

## UNJUST ENRICHMENT
## (BASED ON MASSACHUSETTS LAW)

434.   Massachusetts Plaintiff realleges and incorporate by reference all paragraphs alleged herein.

435.   This claim is brought by the Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

436.   Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Massachusetts Plaintiff and the Massachusetts Subclass.

437.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Massachusetts Plaintiff and other Massachusetts Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

438.   Massachusetts Plaintiff, therefore, seeks an order requiring Ford to make restitution to him and other members of the Massachusetts Subclass.

E.   **Claims Brought on Behalf of the Oregon Subclass**

## COUNT 25

### VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (OR. REV. STAT. § 646.605 *et seq.*)

439.   Plaintiff Samuel Huffman ("Oregon Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

440.   This claim is brought by Oregon Plaintiff on behalf of the Oregon Subclass.

441.   The Oregon Unlawful Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following:

representing that goods have characteristics uses, benefits, or qualities that they do not have; representing that goods are of a particular standard or quality if they are of another; advertising goods or services with intent not to provide them as advertised and certified; and engaging in any other unfair or deceptive conduct in trade or commerce. OR. REV. STAT. § 646.608(1).

442. Ford is a person within the meaning of OR. REV. STAT. § 646.605(4).

443. Each Coastdown Cheating Vehicle is a "good" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

444. Ford engaged in unlawful trade practices that violated the Oregon UTPA when Ford knowingly failed to disclose that the Coastdown Cheating Vehicles did not have the advertised and certified fuel economy and that the fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

445. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact

with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

446.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Oregon Plaintiff and the Oregon Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

447.  Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Oregon Plaintiff and the Oregon Subclass.

448.   Ford knew or should have known that its conduct violated the Oregon UTPA.

449.   Ford owed Oregon Plaintiff and the Oregon Subclass members a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

> a.   Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;
>
> b.   Intentionally concealed the foregoing from Oregon Plaintiff and the Oregon Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Oregon Plaintiff and the Oregon Subclass that contradicted these representations.

450. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Oregon Plaintiff and the Oregon Subclass.

451. Oregon Plaintiff and the Oregon Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Oregon Plaintiff and the Oregon Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Oregon UTPA.

452. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Oregon UTPA. As a direct and proximate result of Ford's violations of the Oregon UTPA, Oregon Plaintiff and the Oregon Subclass have suffered injury-in-fact and/or actual damage.

453. Ford's violations present a continuing risk to Oregon Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

454. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

455. Oregon Plaintiff and the Oregon Subclass are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1). Oregon Plaintiff and the Oregon Subclass are also entitled to punitive damages because Ford engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

456. On July 22, 2019, a copy of the complaint, *Brewer, et. al. v. Ford Motor Company*, No. 19-12135-SJM-RSW, (E.D. Mich. Jul. 22, 2019), now transferred into this MDL, was mailed to the Attorney General of the State of Oregon in accordance with OR. REV. STAT. § 646.638(2).

## COUNT 26

## BREACH OF CONTRACT
## (BASED ON OREGON LAW)

457. Oregon Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

458. This claim is brought by Oregon Plaintiff on behalf of the Oregon Subclass.

459.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Oregon Plaintiff and the Oregon Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Oregon Plaintiff and the Oregon Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Oregon Plaintiff and the Oregon Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

460.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Oregon Plaintiff and the Oregon Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

461.   As a direct and proximate result of Ford's breach of contract, Oregon Plaintiff and the Oregon Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 27

## BREACH OF EXPRESS WARRANTY
### (OR. REV. STAT. § 72.3130)

462.   Oregon Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

463.   This claim is brought by Oregon Plaintiff on behalf of the Oregon Subclass.

464.   Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Or. Rev. Stat. § 72.1040.

465.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

466.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

467.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

468.   These affirmations and promises were part of the basis of the bargain that was reached when Oregon Plaintiff and the other Oregon Subclass members purchased or leased the Coastdown Cheating Vehicles.

469.   Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

470.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

471.   Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Oregon Plaintiff and the Oregon Subclass whole, and because

Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

472.   Accordingly, recovery by the Oregon Plaintiff and the Oregon Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Oregon Plaintiff, individually and on behalf of the other Oregon Subclass members, seek all remedies as allowed by law.

473.   Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Oregon Plaintiff and the Oregon Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

474.   Plaintiff provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

475.   As a direct and proximate result of Ford's breach of express warranties, Oregon Plaintiff and the Oregon Subclass have been damaged in an amount to be determined at trial.

## COUNT 28

## FRAUDULENT CONCEALMENT
## (BASED ON OREGON LAW)

476.   Oregon Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

477.   This claim is brought by Oregon Plaintiff on behalf of the Oregon Subclass.

478.   Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Oregon Plaintiff and the Oregon Subclass information that is highly relevant to their purchasing decision.

479.   The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

480.   Ford further affirmatively misrepresented to Oregon Plaintiff in advertising and other forms of communication, including standard and uniform

material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

481.  Ford knew these representations were false when made.

482.  The Coastdown Cheating Vehicles purchased or leased by Oregon Plaintiff and the Oregon Subclass were, in fact, defective, with reduced fuel efficiency.

483.  Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Oregon Plaintiff and the Oregon Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

484.  As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

485.  The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Oregon Plaintiff and the Oregon Subclass did

not know of these facts and Ford actively concealed these facts from Oregon Plaintiff and the Oregon Subclass.

486.   Oregon Plaintiff and the Oregon Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Oregon Plaintiff and the Oregon Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Oregon Plaintiff and the Oregon Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

487.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Oregon Plaintiff and the Oregon Subclass placed in its representations.

488.   Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Oregon Plaintiff and the Oregon Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

489.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Oregon Plaintiff and the Oregon Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Oregon Plaintiff and the Oregon Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Oregon Plaintiff and the Oregon Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Oregon Plaintiff and the Oregon Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the

Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

490.  Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Oregon Plaintiff and the Oregon Subclass.

491.  Ford has still not made full and adequate disclosures and continues to defraud Oregon Plaintiff and the Oregon Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

492.  Oregon Plaintiff and the Oregon Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Oregon Plaintiff's and the Oregon Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Oregon Plaintiff, or, Oregon Subclass members.

493.  Because of the concealment and/or suppression of the facts, Oregon Plaintiff and the Oregon Subclass have sustained damage because they overpaid for

their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Oregon Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

494.   Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Oregon Plaintiff and the Oregon Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

495.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Oregon Plaintiff's and the Oregon Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 29

## NEGLIGENT MISREPRESENTATION
## (BASED ON OREGON LAW)

496.   Oregon Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

497.   This claim is brought by the Oregon Plaintiff on behalf of the Oregon Subclass.

498.   Defendant made fuel economy representations to Oregon Plaintiff and members of the Class that were not true.

499.   Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Oregon Plaintiff and Oregon Subclass members rely on these misrepresentations.

500.   Oregon Plaintiff reasonably relied on Defendant's representations and as a result Oregon Plaintiff and Oregon Subclass members were harmed.

## COUNT 30

## UNJUST ENRICHMENT
## (BASED ON OREGON LAW)

501.   Oregon Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

502.   This claim is brought by the Oregon Plaintiff on behalf of the Oregon Subclass.

503.   Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Oregon Plaintiff and the Oregon Subclass.

504.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Oregon Plaintiff and other Oregon Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

505.   Oregon Plaintiff, therefore, seeks an order requiring Ford to make restitution to them and other members of the Oregon Subclass.

**F.     Claims Brought on Behalf of the Nationwide Class**

## COUNT 31

### VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT
### (15 U.S.C. §§ 2301 *et seq.*)

506.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

507.   Plaintiffs bring this Count on behalf of themselves and the Nationwide Class.

508.   This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act (for the purpose of this Count, the "Act") by virtue of 28 U.S.C. § 1332(a)-(d).

509.   Plaintiffs and the other Nationwide Class members are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased Coastdown Cheating Vehicles for personal, family, or household purposes.

510.   Ford is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5) because the company regularly sells Ford vehicles accompanied by written Limited Warranties.

511.   The Coastdown Cheating Vehicles are "consumer products" within the meaning of the Act. 15 U.S.C. § 2301(1).

512.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

513.   The amount in controversy of the Plaintiffs' individual claims meets or exceeds $25.00 in value. In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

514.   Ford provided Plaintiffs and the members of the Nationwide Class with written and implied warranties, which are covered under 15 U.S.C. § 2301(6) and (7), respectively.

515.   Ford breached these written and implied warranties as described in detail above. Ford expressly warranted in advertisements and consumer-facing communications, including on the window stickers themselves that were affixed to the Coastdown Cheating Vehicles, that the Coastdown Cheating Vehicles achieve a fuel economy rating of specific MPGs. Ford impliedly warranted that the Coastdown

Cheating Vehicles would conform to the descriptions promised in Ford's advertisements and consumer-facing communications.

516.  Ford breached these express warranties because the Coastdown Cheating Vehicles did not achieve the specific fuel economy rating Ford advertised. Moreover, Ford breached these implied warranties because the Coastdown Cheating Vehicles did not and do not conform to the descriptions advertised.

517.  The terms of the warranties became part of the basis of the bargain between Ford and the Plaintiffs and all other Class members when deciding to purchase a Coastdown Cheating Vehicle.

518.  Plaintiffs and each of the other Nationwide Class members have had sufficient direct dealings with either Ford or its agents (including Ford dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiffs and each of the other Nationwide Class members, on the other hand. Moreover, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between Ford and its dealers. The dealers were not intended to be the ultimate consumers of the Coastdown Cheating Vehicles and have no rights under warranty agreements provided with the Coastdown Cheating Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

519.   Because Ford knew of the defect at the time of the sale, it has waived any opportunity to cure.

520.   As a direct and proximate result of Ford's breach of written warranties and implied warranties of merchantability, Plaintiffs and Nationwide Class members have suffered damages in an amount to be determined at trial.

521.   Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages permitted by law, including without limitation compensation for the additional fuel required to drive the Coastdown Cheating Vehicles, compensation for the inconvenience associated with the additional fill-ups, and the monetary difference between the Coastdown Cheating Vehicles as warranted and as sold, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

62.   Plaintiffs have provided Ford with an opportunity to cure and provided multiple forms of written notice that they will be initiating suit.

## COUNT 32

## FRAUD

522.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

523.   This claim is brought by Plaintiffs on behalf of the Nationwide Class or, in the alternative, the State Classes.

524.   Defendant affirmatively misrepresented and concealed material facts concerning the fuel economy of its vehicles.

525.   Defendant had a duty to disclose the true fuel economy based on its superior knowledge and affirmative misrepresentations to the contrary.

526.   Defendant affirmatively misrepresented and/or actively concealed material facts, in whole or in part, intending to induce Plaintiffs and members of the Class to purchase or lease their vehicles and at a higher price than they otherwise would have.

527.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.   Determining this action may be maintained as a Class action with respect to the Class and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified, and designate and appoint Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      Declaring, adjudging, and decreeing the conduct of the Defendant as alleged herein to be unlawful, unfair, and deceptive;

C.      Requiring that all Class members be notified about the lower fuel economy ratings and higher emissions at Ford's expense and providing correct fuel economy and emissions ratings;

D.      Awarding Plaintiffs and Class members restitution of all monies paid to Defendant as a result of unlawful, deceptive, and unfair business practices;

E.      Awarding Plaintiffs and Class members actual, compensatory damages as proven at trial;

F.      Ordering disgorgement of all profits wrongfully received by Ford for the Coastdown Cheating Vehicles.

G.      Awarding Plaintiffs and Class members all statutory penalties and exemplary damages, as allowed by law;

H.      Awarding Plaintiffs and Class members any and all equitable relief;

I.      Awarding Plaintiffs and Class members reasonable attorneys' fees, costs, and pre- and post-judgment interest;

J.      Awarding restitution, including at the election of Class members, recovery of the purchase price of their Coastdown Cheating Vehicles, or the overpayment or diminution in value of their Coastdown Cheating Vehicles; and

K.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: August 21, 2020        Respectfully Submitted,

By: */s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Emily E. Hughes (P68724)
Dennis A. Lienhardt (P81118)
William Kalas (P82113)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI  48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
eeh@millerlawpc.com
dal@millerlawpc.com
wk@millerlawpc.com

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-05594
steve@hbsslaw.com

*Counsel for Plaintiffs and the Class*